|gDECUIR, Judge.
This difficult case concerns the termination of the defendant’s parental rights. The defendant, Opal Hair, appeals the judgment of the juvenile court terminating her parental rights as to her now six-year-old daughter, Emma Hair. After reviewing the record in detail, we conclude that Ms. Hair’s failure to make any effort at all in compliance with reunification goals warrants termination of her parental rights. Accordingly, we affirm the judgment of the juvenile court.
FACTUAL BACKGROUND
Ms. Hair, a single woman living with and taking care of her elderly mother, adopted two children. Mark[1] was adopted at the age of five in 1985. He is visually impaired. Emma, who is biracial, was adopted as an infant in 1993. Ms. Hair has a degree in microbiology and worked as a chemist. She provided well for her family, although they moved often. She addressed Mark’s vision problems and enrolled him in various extracurricular activities, including Boy Scouts, Junior Deputies, dance classes, and piano lessons. In various evaluations that have been performed on Mark, he has been described as having average intelligence and the ability to obtain a college degree, if he can overcome his reading difficulties which are attributable to his vision impairment. Emma has been described as a happy, well-adjusted child. The record contains *755 no indication that she suffers from any serious problems.
Approximately one year after he was adopted, Mark informed his mother that he had been sexually abused by his foster parents and by employees of the Office of Child Services. He also told her that he had been brought to a Satanic church where ] ¡¡he had seen devil worship and had been subjected to ritualistic abuse. Ms. Hair notified law enforcement personnel and an investigation ensued. Ms. Hair was at one point informed that indictments would be forthcoming shortly. In fact, an expert in ritual child abuse who serves as a law enforcement chaplain, testified at one of the dispositional review hearings in this matter. He testified that Mark’s allegations were credible and that he understood at the time that indictments would be handed down. Instead, the investigation was closed without resolution and without explanation to Ms. Hair. As a result, Ms. Hair testified that she is still unable to trust OCS employees and law enforcement personnel.
Mark was enrolled in the public school system until third grade, at which point Ms. Hair chose to home-school him for two years. Mark then repeated fourth grade at a public school. He suffered academically and had trouble getting around the school campus. At some point, Mark was enrolled in special education classes, and he was taught braille. However, Ms. Hair chose to discontinue the special services when Mark was in fifth grade. He was thereafter placed in a regular classroom with no visual assistance in sixth and seventh grade. He used a magnifying device (referred to in the record as a CCTV) at home for homework. During this time, Mark became somewhat of a discipline problem at school and was suspended at least twice. Both Ms. Hair and Mark informally accused school officials, as well as other students and law enforcement personnel, of various types of abuse and harassment which have not been verified.[2] Mark apparently did not return to the Calcasieu public school |4system after the last suspension in January of 1996. For reasons which will be explained below, he was placed in foster care shortly after the suspension.[3]
Ms. Hair’s mother developed serious health problems in the 1990’s and had numerous surgeries during that time. In fact, Ms. Hair decided to leave her job as a chemist in 1995 to devote more time to her mother’s care. She also testified that she quit because she was being harassed at work and became very angry and upset when she received a negative evaluation from her supervisor. Ms. Hair was assisted in caring for her mother by a home health agency which sent nurses to their home periodically. In early 1996, Ms. Hair’s mother became dissatisfied with one of the nurses who came to check on her. She attempted to fire the nurse and told her not to return; she also instructed Ms. Hair' not to let the nurse in if she ever came back to their home.
The events which followed are somewhat unclear, but apparently, the next time someone from the home health agency went to the home, Ms. Hair would not let them in the house. Ms. Hair allegedly made comments that her house had been *756 bugged by the FBI and that she was being followed and harassed. An Adult Protection Investigator with the Elderly Protection Service was contacted and an investigation ensued. On January 25, 1996, employees from the Elderly Protection Service and from the Office of Child Services went to the home with a police officer. When Ms. Hair came out of the house, the officer spoke to her. She responded to him by telling him that the FBI was harassing her and that certain officers had kidnapped her' son from school. Ms. Hair was informed that she would be taken to the hospital for a IfiPsychiatric evaluation. She was unable to provide the names of anyone who could take care of her children, so they were taken into protective custody. Mark, at the time a fifteen-year-old blind suspended seventh grader, volunteered to care for Emma at their home, explaining that he had cared for her alone for several days when his mother was out of town. Both Mark and Ms. Hair’s mother were hospitalized for evaluation, and Emma was brought to a foster home.
JUDICIAL PROCEEDINGS
Ms. Hair remained in the hospital for seventy-two hours, whereupon she was discharged. She was not found to be a threat to herself or others. At the continued custody hearing held on January 30, 1996, the juvenile court judge ordered Ms. Hair to cooperate with the State’s investigation, continued custody with the State, and recessed the matter until February 2. Ms. Hair then submitted to further psychological testing by Dr. David Post. He diagnosed her with a delusional disorder which has a negative impact on her ability to parent her children.[4] This evaluation was submitted into evidence at the continued custody hearing which resumed on February 5. At the conclusion of that hearing, the court ordered that custody remain with the State and that counsel be appointed to represent Ms. Hair. Trial was set for February 27.
Trial actually began several weeks later, on April 9, 1996. A restraining order had been issued earlier, restraining Ms. Hair from going near her children’s foster homes and schools. Without objection by Ms. Hair’s court-appointed counsel, the juvenile court judge recessed the hearing several times: testimony resumed on April 23; a continuance was ordered on May 24; testimony continued on June 25 and was | fifinally concluded on June 26. At the conclusion of these proceedings, the judge adjudicated the children as neglected and in need of care.[5] The judge further ordered that custody remain with the State, that Ms. Hair cooperate with the case plan, and that supervised visitation be continued.
During this time, Ms. Hair participated in visitation with her children only three times. She testified that she did not want to be supervised by OCS employees who had previously abused her son. She did not keep OCS apprised of her whereabouts so that they could provide her with reports on the children. She testified that she did talk with Mark on the phone.
A dispositional review hearing was scheduled for July 26, 1996. The record does not contain the transcript of a hearing. However, the minute entry for that date and the' dispositional review judgment dated August 9, 1996, show that Ms. Hair’s visitation rights were terminated, apparently due to her hostile attitude toward the OCS workers (throwing an Icee on one of them, for example), as well as the chil *757 dren’s evident fear at seeing their mother. These events were described in a confidential report offered into evidence by the State. Ms. Hair was ordered to cooperate with the OCS and be re-evaluated for psychiatric medication. She was held in contempt of court and jailed until such time as she would agree to cooperate with the OCS ease plan.[6] The case plan required Ms. Hair to submit to psychiatric treatment, cooperate with OCS, behave in a nurturing and caring way toward her children, and maintain a relationship with her children.
17A second dispositional review hearing was held on February 7, 1997.[7] The OCS again recommended that custody remain with the State. Ms. Hair complained that she was not being given any information on her children, such as the fact that she was not informed Mark had tried to commit suicide. The OCS representative informed the court that Ms. Hair consistently refused to meet with the social worker who went to the jail periodically to talk with her. After an argument with the judge, Ms. Hair was removed from the courtroom. The court then ordered that custody remain with the State. Similar judgments were rendered at the next dis-positional reviews held in August of 1997 and in April of 1998.
Several months later, in September, termination proceedings were initiated. A hearing was held in February, and a judgment terminating Ms. Hair’s parental rights as to Emma was signed on March 10,1999.
TERMINATION EVIDENCE
The evidence adduced at the termination hearing showed that on December 8, 1997, Ms. Hair kidnapped Emma from her foster home and absconded with her to Ohio. She located a women’s shelter in Cincinnati and explained what she had done. Louisiana authorities were contacted and Emma was safely returned to her foster home. Ms. Hair was taken into custody and remained in jail at the time of the last review hearing and at the time of the termination proceedings.
The State submitted evidence that Emma has been in the same foster home since she was first taken from her mother’s home in January of 1996. She has bonded with the foster parents and is doing very well. The State also presented the testimony of Dr. Post who evaluated Ms. Hair on one occasion, in February 1996. He believes | «she has a chronic delusional disorder and has a poor prognosis for recovery. However, Dr. James Anderson, a forensic psychiatrist, testified on behalf of Ms. Hair. He disagreed with Dr. Post’s opinions and stated that his evaluation of Ms. Hair revealed no delusional disorder and no psychosis. He believes that Ms. Hair is capable of parenting Emma, and she would not be harmed by returning to her mother’s custody. He did say that he really struggled with this case, given the fact that Emma has been away from her mother for three (now four) years.
GROUNDS FOR INVOLUNTARY TERMINATION
La.Ch.Code art. 1016 sets forth six grounds for the involuntary termination of parental rights. Pertinent to the case before us is the fifth of these enumerated grounds:
Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent’s custody pursuant to a court order; there *758 has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent’s condition or conduct in the near future, considering the child’s age and his needs for a stable and permanent home.
Under La.Ch.Code art. 1035, the State must prove “each element of a ground for termination of parental rights by clear and convincing evidence.” Article 1036(C) describes the type of evidence necessary to prove the specific ground specified in Article 1015(5), the lack of parental compliance with a case plan. In the instant ease, the State presented evidence of the following:
(1) Ms. Hair’s failure to attend eourt-appioved scheduled visitations with Emma;
(2) Ms. Hair’s failure to communicate with the child; •
(3) Ms. Hair’s failure to keep the department apprised of her whereabouts;
la(4) Ms. Hair’s repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan; and
(5) Ms. Hair’s lack of substantial improvement in redressing the problems preventing reunification.
Furthermore, the State complied with Art. 1036(D)(1) which describes the type of evidence necessary to prove a lack of any reasonable' expectation of significant improvement in the parent’s conduct. The State presented expert testimony showing that Ms. Hair’s mental disorder renders her incapable of exercising her parental responsibilities without risk of harm to Emma. The evidence of her pattern of behavior is also revealing. In the years that Emma has been in the State’s custody, Ms. Hair’s condition and conduct have only deteriorated as reflected in her criminal conduct, unemployment, and apparent homelessness. Dr. Post, testifying for the State, described Ms. Hair as chronically mentally ill. He .stated that “in the long run, that condition will not go away, and it will continue to interfere with her parenting abilities in the same way that it has so far.”
Our review of the record reveals that the State did meet its burden of proof with clear and convincing evidence. More than one year has elapsed since Emma was removed-from her mother’s custody; there has been no substantial compliance with the OCS case plan; and there is no reasonable expectation of significant improvement in Ms. Hair’s condition or her conduct.
This court has previously discussed the standard of review in cases such as the one at bar:
The trial court found that the State had carried its burden of clear and convincing evidence. In matters requiring determinations of credibility, allocation of weight to testimony and factual determinations as to fitness, reformation, and reasonableness of the department’s actions, the trial court is in the best position to make such findings. Therefore, the findings of the trial court will not be disturbed on appeal absent a showing of manifest error.
State in the Interest of Broussard, 94-1613 (La.App. 3 Cir. 5/3/95); 657 So.2d 121, 123.
We have reviewed the record in great detail and with high regard for Ms. Hair’s parental rights. We believe, however, that she has put forth no effort to comply with the case plan devised by the OCS for the reunification of her family in the three years Emma has been in foster care. The fact that she has done nothing at all to maintain a relationship with Emma, regardless of her distrust of OCS workers given the history with Mark, shows that she has no interest in improving her con *759 duct and providing a stable home for her young daughter.
DECREE
For the above and foregoing reasons, the judgment of the juvenile court is affirmed. Costs of this appeal are assessed against appellant, Opal Hair.
AFFIRMED.
SAUNDERS, J., dissents.
WOODARD, J., dissents and assigns written reasons.
PETERS, J., concurs in the result.

. Mark was the subject of most of the testimony at the dispositional review hearings; he has now, however, reached the age of majority and is not a party to these proceedings.

. Allegations included the payment of money by law enforcement personnel to students to beat Mark up, the confiscation of Mark’s glasses and jacket by school officials, vandalism by FBI agents throwing bricks in the windows of the Hair home, and the placement of an illegal wiretap and unauthorized use of their phone lines. (Phone bills totaling over $11,000 were introduced into evidence.)

. The evidence concerning Mark’s mental health is ambiguous. The record before us contains no testimony from Mark, but several psychological evaluations are discussed throughout the proceedings. At times, Mark seemed to share his mother's delusions about the FBI. At other times, he claimed that his mother forced him to say that the family was being harassed and that he had been abused in early childhood. Still at other times, it appeared that Mark may have actually committed the acts that Ms. Hair attributed to the FBI and others.

. Dr. Post also met with Mark who told him about his mother’s distrust of everyone and her belief that every person in his life, every teacher, every friend, everyone, has abused him somehow. Mark also told Dr. Post that his mother would station him at the front door of their house with a can of mace.

. Because this adjudication was not timely appealed by Ms. Hair's court appointed counsel at the time, the delays in the proceeding were never reviewed under La. Ch. Code art. 1032, nor were the merits reviewed. It is of no moment herein.

. The juvenile judge revealed at a subsequent hearing that he had revoked the contempt order shortly after it was issued. Ms. Hair remained in jail, however, for more than four months. It was suggested that she refused to pay the processing fees and, therefore, could not be released from jail.

. Ms. Hair was still in jail at that time, but apparently she was being held on charges stemming from an altercation she had with the principal of Mark’s school prior to Mark being placed in the custody of the State.