h SULLIVAN, Judge.
T.H.L. appeals the termination of her parental rights to her three minor daughters pursuant to La.Ch.Code art. 1015(5).[1] For the following reasons, we affirm.
Discussion of the Record
T.H.L. is the mother of three daughters: H. H., born August 13, 1986; S. H., born August 7, 1987; and D. H., born August 23, 1988.[2] The three girls were removed from their mother’s custody on August 29, 1994, after T.H.L. had beaten the youngest child on her face and left leg with a stick. The State of Louisiana, through the Department of Social Services (the Department), transferred custody of the children to their maternal grandmother, but assumed custody again upon learning that the grandmother permitted them to live with their mother. The three girls were adjudicated as children in need of care on July 15, 1996. They were placed together in two foster homes before they went to live with their current foster mother and maternal aunt, T. S., in May of 1998. On October 8, 1998, the Department filed a petition to terminate T.H.L.’s parental rights so that the children could be adopted by their aunt.[3]
Initially, however, the Department had attempted to reunite the children with their mother. Sally Taylor, a community services supervisor, began working with the family toward this goal in October of 1994. Ms. Taylor testified that the original case plan required T.H.L. to undergo psychological counseling, attend parenting classes, Land maintain a permanent residence with utilities. Ms. Taylor detañed several instances in which T.H.L. faüed to comply with this plan, including missing parenting classes and counseling sessions, requiring a court order before she would undergo a psychological evaluation, failing to communicate with department personnel, and failing to report additional income. Additionally, Ms. Taylor observed that T.H.L. behaved inappropriately in supervised visits with her children. When visitation took place at a local mall, T.H.L. *488 and the children would spend the entire time playing video games rather than visiting. Because of this conduct, the Department rescheduled the visits to one of its offices. On those occasions, the children were unruly, with T.H.L. interacting with them “as a child rather than as a parent.”
T.H.L. had previously been evaluated by Dr. Sam Williams, a psychologist, who issued a report on February 21, 1994. In his initial evaluation, Dr. Williams observed T.H.L. to be defensive, suspicious, and easily insulted. He believed that she had difficulty trusting others, tended to hold grudges, and blamed others for her misfortunes and problems. He also noted undercurrents of anger and hostility, possibly stemming from sexual abuse that she reportedly suffered as a child. He found no evidence of a psychotic disorder or acute emotional disturbance, but he described her as someone who was not interested in changing because she did not see herself as having psychological problems.
In November of 1995, T.H.L.’s case was transferred to social services worker, Ca-rola Whitehurst, with the Department’s goal remaining reunification of the family. Ms. Whitehurst testified that T.H.L. initially showed progress, such as attending an anger management class on her own initiative. However, she gradually lessened her 1 ¡¡compliance to the point where she exhibited a lack of commitment to long-term counseling and to utilizing the Department’s services. In the first six months of Ms. Whitehurst’s involvement, T.H.L. missed several counseling sessions without explanation, attended only three of six parenting classes, and had only sporadic attendance at a sexual abuse survivors’ group as required by her case plan. Because of this lack of compliance, the Department decided not to return the children at a family team conference on May 22, 1996. When T.H.L. was informed of this decision, she became angry and said she no longer wished to cooperate. Thereafter, T.H.L. refused to communicate with the Department until July 27, 1996, after the children had been adjudicated in need of care. Although the Department still sought reunification of the family, a case plan filed with the trial court on July 15, 1996 contained the notation that T.H.L. did not complete the recommended long-term counseling to address issues of anger management, sexual abuse, co-dependency, parenting failures, and discipline skills.
Dr. John Simoneaux, a psychologist, evaluated T.H.L. on February 3, 1996, and the children on October 14, 1996. He diagnosed her with a passive/aggressive personality disorder with antisocial dependent features. He believed that she had made little progress with therapy. Considering that her efforts at counseling were at best half-hearted, Dr. Simoneaux formulated a poor prognosis that T.H.L. would ever be able to parent her children. Because the abuse in this case involved a beating with a stick that caused two black eyes and bruises on other parts of the child’s body, Dr. Simoneaux believed that T.H.L. still posed a danger to her children’s welfare. He testified that for someone with T.H.L.’s personality disorder to improve, there had to be (1) motivation, (2) a level of distress that increases motivation, and (3) |4insight, which he considered rare in someone with such a disorder. Acknowledging that T.H.L. admitted her abusive conduct and expressed her motivation for the return of her children, Dr. Simoneaux nonetheless testified: “I think she wants her children back. I think that there’s a lot more to her getting better than simply wanting them back. And I think it’s those things that are woefully inadequate.”
In his evaluation of the children, Dr. Simoneaux described all three girls as internally distressed, although the two younger girls were not as afraid of their mother as the oldest child. Dr. Simo-neaux believed that the children had not experienced a stable home life, which he considered important to their mental health. Although he testified that the ideal situation would be for the children to have some contact with them mother, he *489 also said that it would be detrimental for her to “pop in and out” inconsistently in their lives. He recounted that “[t]hree years ago, I was saying take them out of limbo and put them some place stable and safe. I mean, I certainly believe that now.” Because he did not believe that T.H.L. would be there “unfailingly” as a parent, he concluded that “it probably would be best for the children to go on some other way to establish stability in their lives.”
At the time of Dr. Simoneaux’s evaluation, T.H.L.’s file was being handled by case worker Betty McBride. By the time of trial, Ms. McBride had relocated out of state, so her supervisor, Rita Jackson, testified about the case activity at that time. At a family team conference in May of 1997, the Department noted that T.H.L. had only visited with the children three out of seven times in the previous six months, that she had not completed her parenting class, and that she had not kept the Department informed of her housing situation. According to Ms. Jackson, T.H.L.’s compliance and communication had improved by the next family team conference in November [ Rof 1997, but T.H.L. still did not follow through with her therapy program. On December 4, 1997, the trial court approved a case plan with the new goal of adoption by the girls’ current foster mother and aunt, T.S. That case plan noted that T.H.L. did not make adequate progress in previously identified problem areas, which prevented the return of the children to her home.
In February of 1998, T.H.L.’s case was transferred to Calcasieu Parish where she had moved after she remarried. Valerie Coleman, her foster care worker from March through December of 1998, also reported that T.H.L. inconsistently attended counseling and refused to participate in a sexual abuse victimization program. According to Ms. Coleman, T.H.L.’s noncompliance occurred while she lived with her new husband, whom T.H.L. described as abusive to her. Danielle Roche, a counsel- or intern in Lake Charles, Louisiana, began working with T.H.L. to improve her commitment to therapy and to address her methods of disciplining her children. Ms. Roche reported that T.H.L. attended only sixty-one percent of scheduled sessions and that she was unwilling to attend a basic parenting course because she had completed one in the past. Ms. Roche testified that T.H.L. was at first uncomfortable and defensive, but she later recognized and wanted to change her cycle of abuse, particularly in the way she handled her children.
Martha Murray was the final foster care worker to have contact with T.H.L. Ms. Murray testified that T.H.L. still had to address her parenting skills, her anger, some of which was the product of past sexual abuse, and to keep the Department informed of her whereabouts. She met with T.H.L. monthly until August of 1999, when T.H.L. apparently moved without informing anyone at the Department. She did not hear from T.H.L. again until October, when T.H.L. suggested that she may |fibe moving to Alexandria, Louisiana. Ms. Murray acknowledged T.H.L.’s desire to parent her children, but expressed concern that her anger about family members and past events had not been addressed through counseling.
Dr. Williams interviewed T.H.L. again on November 11, 1998, almost five years after his previous evaluation. Dr. Williams still questioned T.H.L.’s ability to consistently and safely care for her children, given that she continued to suffer from a personality disorder with anti-social, narcissistic, and paranoid traits. He also expressed concern about her continued instability in employment and in relationships. He noted that T.H.L. had progressed in that she admitted the abuse of her daughter and was more cooperative and humble. However, he testified that any further improvement would be contingent on T.H.L.’s recognition that she has long-term, character-based problems which would require “a year or two” of *490 weekly counseling and a concerted effort to change. He attributed any progress thus far to the gravity of these proceedings rather than to fundamental changes. Given the lack of reflection and insight common to those with her personality disorder, Dr. Williams, as did Dr. Simoneaux in 1996, formulated a poor prognosis that T.H.L. would ever be able to successfully parent her children.
At trial, T.H.L. admitted that she abused her daughter and expressed profound regret for the pain she inflicted upon her child. She acknowledged that she still needed self-improvement classes and pledged to follow up with those regardless of the outcome of these proceedings. She attributed her noncompliance in the past to a lack of funds and transportation rather than to a lack of motivation to be reunited with her children. Although her employment (in the construction field) had not been 17steady the past year, she testified that she had a job lined up and had made arrangements for neighbors to care for her children while she was at work.
After a trial on December 8 and 9, 1999, the trial court terminated T.H.L.’s parental rights pursuant to La.Ch.Code art. 1015(5), finding that she failed to substantially comply with the Department’s plan for reunification with the children and that there was no reasonable expectation of significant improvement in the future.
Opinion
The trial court found that the Department had proved the grounds for termination of parental rights as set forth in La.Ch.Code art. 1015(5):
Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent’s custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent’s condition or conduct in the near future, considering the child’s age and his need for a safe, stable, and permanent home.
La.Ch.Code art. 1036(C) and (D) (emphasis added) provide the following guidelines for use in determining whether the above grounds have been met:
C. Under Article 1015(5), lack of parental compliance with a case plan may be evidenced by one or more of the following:
(1) The parent’s failure to attend court-approved scheduled visitations with the child.
(2) The parent’s failure to communicate with the child.
(3) The parent’s failure to keep the department apprised of the parent’s whereabouts and significant changes affecting the parent’s ability to comply with the case plan for services.
(4) The parent’s failure to contribute to the costs of the child’s foster care, if ordered to do so by the court when approving the case plan.
Is(5) The parent’s repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.
(6) The parent’s lack of substantial improvement in redressing the problems preventing reunification.
(7) The persistence of conditions that led to removal or similar potentially harmful conditions.
D. Under Article 1015(5), lack of any reasonable expectation of significant improvement in the parent’s conduct in the near future may be evidenced by one or more of the following:
(1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion *491 or based upon an established pattern of behavior.
(2) A pattern of repeated incarceration of the parent that has rendered the parent unable to care for the immediate and continuing physical or emotional needs of the child for extended periods of time.
(3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.
The grounds for termination of parental rights must be established by clear and convincing evidence. La.Ch.Code art. 1035. Additionally, the evidence must support the conclusion that termination is in the best interest of the child. State in the Interest of D.T. v. K.T., 29,796 (La.App. 2 Cir. 6/18/97); 697 So.2d 665.
In reviewing the trial court’s decision in a termination of parental rights case, this court has stated:
In matters requiring determinations of credibility, allocation of weight to testimony and factual determinations as to fitness, reformation, and reasonableness of the department’s actions, the trial court is in the best position to make such findings. Therefore, the findings of the trial court wall not be disturbed on appeal absent a showing of manifest error.
1 giState in the Interest of Hair, 99-1043, p. 9 (La.App. 3 Cir. 2/2/00); 757 So.2d 754, 758, writ denied, 00-705 (La.5/12/00); 762 So.2d 13 (quoting State in the Interest of Broussard, 94-1613, p. 3 (La.App. 3 Cir. 5/3/95); 657 So.2d 121, 123).
On appeal, T.H.L. assigns as error the trial court’s finding that she failed to comply with her case plan. She cites evidence of the counseling that she undertook on her own initiative as well as the statements of progress noted by her case workers and psychologists. In particular, she refers to Dr. Williams’ testimony that over the past five years, she has approached this matter in “a more sober-minded fashion” and that it was within the “realm of possibilities” that she would transform herself into a fit parent. She also relies on Ms. Roche’s remarks that she gained “some bits of insight” in the cycle of abuse that she has perpetuated with her children and on Ms. Jackson’s description of a six-month period of good compliance with the Department’s plan.
Upon review of the record, we find no error in the trial court’s conclusion that the Department established all three requirements for termination under Article 1015(5) by clear and convincing evidence. The first requirement, that more than one year had elapsed since the removal of the children pursuant to a court order, is not in dispute. The children were first removed in 1994 and a second time in 1996. The Department filed this action for termination on October 10, 1998. Indeed, the length of the Department’s involvement with these children is relevant to the remaining requirements, the lack of substantial compliance with a court-approved case plan and no reasonable expectation of significant improvement in the parent’s condition or conduct.
| ¶Although T.H.L. exhibited improvement at times, she was also at times deficient in almost all aspects of the Department’s plan for reunification. She missed visitation with the children, failed to keep the Department informed of her whereabouts, and, most importantly, failed to follow through with long-term counseling. These problems relate to several examples of parental noncompliance found in Article 1036(C), in particular subpara-graphs (5) and (6): the repeated failure to comply with her plan of treatment or rehabilitation services and the lack of substantial improvement in redressing problems preventing reunification. Thus, the Department has established Article 1015(5)’s second requirement for termination of parental rights.
*492 Dr. William’s statement that it was possible for T.H.L. to one day parent her children must be viewed within the context of his entire testimony. According to Dr. Williams, T.H.L. would need up to two additional years of counseling as well as a concerted commitment to change to reach this goal. When asked about the probability of this happening, Dr. Williams stated that “as far as we understand her type of personality disorder, ... the prognosis for change is poor.” Concerning the progress already made, Dr. Williams testified:
I continue to have concerns that more fundamental and basic changes have not-had not transpired. The personality disorder continued even though we’ve had a five year span of time there and I did not see any better understanding of herself and her problems and how these might relate to her parental competence.
In State in the Interest of S. M., 98-922, p. 10 (La.10/20/98); 719 So.2d 445, 450 (quoting State in the Interest of E. G., 95-18, p. 5 (La.App. 1 Cir. 6/23/95); 657 So.2d 1094, 1097, writ denied, 95-1865 (La.9/1/95); 658 So.2d 1263), the supreme court stated: “[Reformation of the parent is shown by a ‘significant, substantial | uin dication of reformation ... such as altering or modifying in a significant way the behavior which served as a basis for the state’s removal of a child from the home.’ ” In the present case, the Department has established that T.H.L.’s conduct does not rise to this level. Additionally, under Article 1015(5), a reasonable expectation of significant improvement in the parent’s condition or conduct must be considered in light of the child’s age and need for a safe, stable, and permanent home. In 1996, Dr. Simoneaux recognized that the children did not have a stable home, which he considered important to their mental health. At trial, T.H.L. herself admitted that the five years between the first removal from her custody and trial of this matter had been too long to keep her children “in limbo.” Based on the testimony of Drs. Williams and Simoneaux, and on T.H.L.’s history with the Department, we find the Department has established the final requirement for termination under Article 1015(5).
La.Ch.Code art. 1037(A) (emphasis added) provides: “When the court finds that the alleged grounds set out in any Paragraph of Article 1015 are proven true by the evidentiary standards required by Article 1035 and that it is in the best interest of the child, it shall order the termination of the parental rights of the parent against whom the allegations are proven.” In applying this final consideration, we note the trial court’s favorable comments on the children’s current placement with their aunt: “I think that the adults around them are providing them some good opportunities in life. Learning good lessons about saving money and working hard.” The trial court also commented on T.H.L.’s history with the Department: “I guess what really impresses the court is that despite this very long history with the agency, that there’s never been any change in the mother’s lifestyle. That there’s continued instability in | ^housing, employment, relationships with others,.... ” Based upon these observations, as well as the totality of the record, we find that termination is in the best interest of these children.
Decree
For the above reasons, the judgment of the trial court is affirmed. Costs of this appeal are assessed to T.H.L. to the extent that she is financially able. See La.Ch. Code art. 321.
AFFIRMED.

. To protect the minor children, we have identified all parties by their initials only.

. T.H.L. also has a minor son, T. S., who is now living with his father and who is not involved in these proceedings.

. The girls' legal father, R.P. H., executed a voluntary act of surrender on August 3, 1999.