719 So.2d 445 (1998)
STATE of Louisiana in the Interest of S.M., et al.
No. 98-CJ-0922.
Supreme Court of Louisiana.
October 20, 1998.
*446 Anne Derbes Keller, Adams & Johnson, New Orleans, for Applicant.
Clarence L. Richardson, Jr., F. Clayton Latimer, New Orleans, for Respondent.
KNOLL, Justice.[*]
This writ concerns a juvenile court proceeding. At issue before us is whether the juvenile court should have rejected the plan for reunification of three minor children with their mother and commenced involuntary termination of parental rights. Pivotal to this inquiry is our determination of whether the juvenile court correctly concluded that the State proved that the mother has shown a reasonable expectation of her reformation exists in the foreseeable future sufficient to justify family reunification. The three minor children objected[2] to this ruling and urged that in view of the law and evidence, involuntary termination of the mother's parental rights should commence so the children can be adopted. The Court of Appeal, Fourth Circuit, finding that the State presented sufficient evidence of the mother's reformation, affirmed the juvenile court's judgment that the Permanency Placement Plan for the three minor children is reunification with their mother. State of Louisiana In the Interest of S. M., 97-CA-1896 (La.App. 4 Cir. 3/4/98), 709 So.2d 927. We granted this writ application on behalf of the three minor children to review the correctness vel non of the lower courts and to expound upon our earlier statements in State in Interest of L.L.Z. v. M.Y.S., 620 So.2d 1309 (La.1993). State in the Interest of S. M., 98-CJ-0922 (La.5/15/98), 719 So.2d 59. For the following reasons, we reverse, finding that there was not sufficient evidence to support the recommendation for the Permanency Placement Plan, and remand this matter to the juvenile court for an expedited hearing.

FACTS AND PROCEDURAL DISPOSITION
Between her 16th and 18th birthdays, N.M. gave birth to three children: K.M., a boy, on July 16, 1991; S.M., another boy, on November 2, 1992; and J.M., a girl, on June 13, 1994.[3] After K.M.'s birth, he lived with *447 Rosa Dunn, his great grandmother, and after S.M.'s birth, he lived with Edna Dunn, the mother of Lonjay Earlycutt, the man with whom N.M. lived during her pregnancy and who believed he was S.M.'s father. N.M. has never lived in a home of her own. She mainly lived in an apartment provided by others.
After N.M. was pregnant with J.M., she began living with James Johnson who was approximately twenty-four years of age. During this same period of time, N.M., for the first time, brought her two sons, K.M. and S.M., to live with her. On January 10, 1996, Johnson beat S.M., the middle child who was three years old, so badly that N.M. called 911 because S.M. was not breathing; the beating occurred, in part, while N.M. was not at home and continued after she returned home. When the police arrived at the scene, they found S.M. unconscious and not breathing, with bruises and welts about his body, and two black eyes. Although the police officers thought that S.M. was DOA, they transported him to the nearest medical facility, Medical Center of Louisiana, where he was revived. Upon medical examination, it was determined that S.M. had multiple scalp bruises, a right temporal contusion, periorbital swelling, an old trauma on his chest with generalized bruising, old abdominal scars, bruised lower extremities with old burns, burns on the left knee and ankle, an open laceration on the right hand, an abrasion to the left axilla, an ulcer on the glans penis which had second-degree burns as well as healed burns, and multiple old scars on the back and buttocks. Orthopedic examination showed that S.M. suffered a fracture of the distal left ulna with callus formation compatible with healing which required the placement of a plaster cast, as well as a dislocation fracture of the capitulum of the humerus.
Matthew Riles, a detective assigned to the Child Abuse Section of the Emergency Services Bureau, interviewed N.M. She told Detective Riles that Johnson had been abusing S.M. since March of 1995. She said that Johnson made S.M. sleep in the bathtub almost every night because S.M. often wet the bed. She also described incidents where Johnson struck S.M. with his hands and a bowl of food and one occasion where Johnson burned S.M. with hot water. She told Detective Riles that she had not told anyone about the abuse because Johnson had threatened to "take care of her" if she told and she was afraid.
Detective Riles also questioned K.M., who, along with J.M. and N.M., had been brought to the Child Abuse Office when S.M. was hospitalized. K.M. told Detective Riles that Johnson hit him, and had put hot water on him and S.M. He further described occasions where Johnson hit S.M. with his hands and his mother's shoe, and where he had tied S.M.'s hands. A medical examination of K.M. revealed bruises on his chest and behind his right ear, as well as old scars from belt marks on his buttocks. Medical personnel also examined J.M. and found that she had a bump on her forehead.
Based upon the children's abusive injuries and the above information, N.M. and Johnson were arrested. N.M. was charged and pleaded guilty to three counts of cruelty to juveniles. She was sentenced to concurrent five year terms with the Department of Corrections on each count; the sentencing court suspended the sentence and placed N.M. on five years active probation. As a special condition of probation, the sentencing court required N.M. to serve twelve months imprisonment with the Department of Corrections, earn her graduate equivalency diploma (GED), and obtain vocational technical school training.[4] Johnson was charged with three counts of cruelty to a juvenile and the attempted second-degree murder of S.M. He pleaded guilty and was ordered to serve an *448 eight and one-half year sentence, without the benefit of probation or suspension of sentence.[5]
On January 11, 1996, an oral instanter order issued, placing N.M.'s three minor children in the protective custody of the State. At a probable cause hearing held on January 12, 1996, the Juvenile Court for the Parish of Orleans found that there were reasonable grounds to find the three children abused and neglected, and in need of care, and awarded their provisional protective custody to the State. On February 12, 1996, the District Attorney initiated proceedings to have the three minor children adjudicated children in need of care. At a hearing on May 15, 1996, it was stipulated that the three minor children, K.M., S.M., and J.M., were abused/neglected children in need of care, and an order issued placing them in protective custody. The juvenile court awarded the care, custody and control of the children to the Office of Community Services (OCS) for a period of eighteen months. S.M. was placed in the home of a foster parent; K.M. and J.M. were placed in the home of their maternal great grandmother, Rosa Dunn. On August 30, 1996, S.M. was moved from the first foster home and placed in the home of Edna and Edgar Alexis.
On November 4, 1996, after serving approximately nine months of her sentence, N.M. was released from prison and began her five year probationary period. Upon release from prison, N.M. moved in with Johnson's sister.
At a review hearing on November 14, 1996, the juvenile court noted that OCS had developed a plan goal of reunifying the three minor children with their mother. In order to achieve reunification, the juvenile court decree contained the following provisions:
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the parent(s) participate in the following programs in order to achieve re-unification at the earliest possible time, by demonstrating to the Court that the behavior leading to the adjudication of dependency have [sic] been eliminated or significantly reduced, such that the child [sic] is no longer at risk. More specifically, the mother, N.M., is ordered to immediately:
1) Enroll in, fully participate in, and successfully complete parenting classes.
2) Submit to a psychological evaluation, submit to all treatment as indicated, fully participate in all counselling [sic] and treatment and consistently take all medication as prescribed.
3) Enroll in, and fully participate in, and successfully complete a "Battered Women's" program.
4) Obtain stable housing.
5) Maintain regular contact with the OCS.
The mother is further ordered to appear on time for all evaluations, treatments, services, and programs outlined above. (Emphasis added).
In the meantime, the judgment continued the children in the legal custody of OCS, confirmed their placements as being the least restrictive and in their best interest, provided N.M. with weekly supervised visitation with the children, and granted liberal sibling visitation.
On December 16, 1996, Dr. J. Steven York, a clinical psychologist, interviewed N.M. to "assess [her] ability to parent her children and to determine whether she require[d] psychotherapy." Succinctly stated, Dr. York found that N.M. had limited ability to parent children, that her thinking was immature, that she had minimal motivation for the return of her children, and that she did not believe that she could handle all three children. He further recorded that N.M. expressed that it was best for her three children to remain in foster care. He recommended that N.M. undergo psychotherapy to explore her needs and motivations for the return of her children and stressed that psychotherapy was essential to evaluate if reunification would overwhelm her if all of the children were returned.
*449 Following a second review hearing on January 30, 1997, the juvenile court entered a judgment continuing OCS's custody of the children, confirmed the home placements of the children, and further noted that N.M. had been complying with the case plan and the court's orders. At that time, the court set a Permanency Placement Planning hearing for July 31, 1997.
At the July 31st hearing, the juvenile court heard the testimony of N.M. and Zelda Sereal, the OCS case worker who has overseen this case since May of 1996. Ms. Sereal testified that N.M. was again pregnant, and since March of 1997, she had been living with the grandmother of the man who allegedly fathered this child.[6] She further testified that N.M. completed a parenting program and a battered women's program in February and May of 1997, respectively. She also stated that N.M. completed a GED program at the beginning of 1997 and that she had been employed at a MacDonald's restaurant until medical problems associated with her pregnancy caused her to quit. During the hearing, it was also learned that N.M. had attended three psychotherapy sessions with Gwendolyn Charles, a board certified social worker, but was resistant to continuing; as a result of N.M.'s unwillingness to attend, the therapist canceled further sessions. The juvenile court also reviewed the OCS report of July 16, 1997, and the July 29, 1997, CASA report,[7] both urging reunification. These reports based their opinion on N.M. completing some of her conditions of probation mentioned above. Profoundly missing from their opinions are the reports from the health professionals and social workers that evaluated N.M., and find the N.M. did not make progress toward changing her conduct that led to the abusive injuries of the children. All of these reports were against the reunification plan and expressed grave concern for the children's welfare if the juvenile court would approve the reunification plan. These grave concerns were not addressed by OCS, CASA, or the juvenile court.
After considering the testimonies of the OCS case worker and N.M., together with the various reports, the juvenile court continued the three minor children in OCS's custody and approved the plan for reunification. However, the juvenile court concluded that reunification at a later time should be gradual and incremental, starting with J.M., the youngest child. It ordered N.M. to continue taking those steps needed to enable her to care for her children; she was told to submit to psychotherapy, participate in family therapy with her children and obtain stable housing, all to the court's satisfaction. The juvenile court further ordered OCS to schedule another hearing when OCS considered that it was appropriate for J.M. to be returned to N.M.'s care. The juvenile court next specified that it, not OCS, would retain oversight of this case. On this basis, the juvenile court stated that the children would not be returned to N.M. unless it was fully satisfied that such reunification was in the best interest of the children.
The children's attorney appealed the juvenile court judgment, urging that N.M. was unfit to retain parental control and there was no reasonable expectation of reformation in the foreseeable future. Their attorney further submitted that based on the law and evidence, the juvenile court should have ordered the filing of a petition for the involuntary termination of parental rights. In support of this argument, the children pointed out: (1) N.M.'s past and current history of unstable male relationships and unstable lifestyle; (2) her inability to earn money sufficient to sustain the children; and (3) her lack of parenting skills. In rejecting this argument, the appellate court found no manifest error on the part of the juvenile court, highlighting that N.M. had completed parenting classes and a "battered women's" program, obtained her GED, acquired employment, submitted to psychological evaluation, and *450 attended three counseling sessions. In a strongly worded concurrence, Judge Plotkin stated that he did not think that reformation and reunification were likely in the "foreseeable future." He nonetheless felt jurisprudentially bound that unless there has been absolutely no progress toward reformation, termination of parental rights was not a viable option.

STANDARD FOR PERMANENCY PLACEMENT PLAN AND REFORMATION
From the outset, we note that this case presents us with a review of OCS's Permanency Placement Plan as proposed to the juvenile court pursuant to Chapter 13 of the Children's Code.
Even though the focus of our opinion is on the mother's reformation, this issue is presented to us in the context of whether reunification, the objective of this Permanency Placement Plan, is "consistent with the best interest and special needs of the child[ren]." La.Ch.Code art. 675. Throughout the remainder of this opinion we refer to the jurisprudence and codal provisions regarding parental reformation in the context of the termination of parental rights, La.Ch.Code art. 1015, since it has been in that framework that courts have shaped the concept of parental reformation.[8]
Prior to August 15, 1997, there was no statutory guidance in determining whether the parent had shown "reformation" sufficient to preserve family reunification as a viable option to termination of parental rights.[9] However, after reviewing the jurisprudence, we established the test in State in Interest of L.L.Z. that "a reasonable expectation of reformation is found to exist if the parent has cooperated with state officials and has shown improvement, although all of the problems that exist have not been eliminated." 620 So.2d at 1317 (emphasis added). Utilizing our statement in State in Interest of L.L.Z. as a springboard for elaboration, several appellate courts have held that "reformation" means more than mere cooperation with agency authorities. More importantly, reformation of the parent is shown by a "significant, substantial indication of reformation... such as altering or modifying in a significant way the behavior which served as a basis for the state's removal of a child from the home." State in Interest of EG, 95-0018 (La.App. 1 Cir. 6/23/95), 657 So.2d 1094, writ denied, 95-1865 (La.9/1/95), 658 So.2d 1263; see State in Interest of J.M., 30,302 (La.App. 2 Cir. 10/29/97), 702 So.2d 45, writ denied, 97-2924 (La.2/6/98), 709 So.2d 736; State in Interest of T.D. v. Webb, 28,471 (La.App. 2 Cir. 5/8/96), 674 So.2d 1077; State in Interest of BJ, 95-1915 (La.App. 1 Cir. 4/4/96), 672 So.2d 342, writ denied, 96-1036 (La.5/31/96), 674 So.2d 264; State in Interest of GA, 94-2227 (La.App. 1 Cir. 7/27/95), 664 So.2d 106; see also State in Interest of Four Minor Children v. D.W., 585 So.2d 1222 (La.App. 2 Cir.1991). Furthermore, the jurisprudence has held that "[a] parent who professes an intention to exercise his or her parental rights and responsibilities must take some action in furtherance of the intention to avoid having those rights terminated." State in Interest of J.M., 702 So.2d at 49; see also State in Interest of D.T. v. K.T., 29,796 (La. App. 2 Cir. 6/18/97), 697 So.2d 665.
In reviewing the appellate courts' treatment of reformation since we rendered State in Interest of L.L.Z., we find that their elaboration is fully in accordance with our ruling and our application of that pronouncement to the facts of that case.[10] We recall that the *451 parent in State in Interest of L.L.Z. not only cooperated with the Department of Social Services, but also showed improvement in the areas which had allegedly caused the State to intervene on behalf of the child's protection. Additionally, we found that the parent exhibited that her conduct had stabilized. State in Interest of L.L.Z., 620 So.2d at 1317. In that case, we particularly noted that the parent learned "how to keep house, deal with her finances, and provide food and shelter for her step-children." Id. Without so specifically enunciating, in reality we found that the mother showed improvement by altering or modifying in a significant way the behavior which served as a basis for the State's removal of her child from the home.
In the present case, we find that the lower courts improperly focused their evaluation of the Permanency Placement Plan on N.M.'s cooperation with OCS and failed to assess whether she exhibited significant improvement in the particulars that had caused the State to remove her children from her care and custody. Specifically, in weighing the feasibility of the proposed Permanency Placement Plan, we find that the lower courts failed to address the significant and serious issues posed from the outset by Dr. York and continuously reiterated by the various social workers and further neglected to ascribe the negative value that N.M.'s unimproved behavior necessitated.
From the very beginning, Dr. York stressed N.M.'s immature thinking process, her verbalized concern that she may not be able to handle all of her children, and her need to undergo individualized psychotherapy to address her role in her children's abuse/neglect as an integral facet of any reunification plan. Despite this, the record establishes that as of the time of the July 31, 1997, Permanency Placement Planning hearing, N.M. had discontinued individual psychotherapy, family psychotherapy had not yet begun, and she had not exhibited behavior that evidenced her ability to care for the needs of her three children in any respect. The paramount evidence in a case such as this, i.e., a significant and substantial indication of reformation from behavior which served as a basis for the State's removal of the children, is totally lacking from the record. To the contrary, the evidence overwhelmingly shows that her prognosis along these lines is dismal at best.
All of the social workers who observed and assisted N.M. and her children objected to OCS's proposed reunification plan.[11] Karen Pellerin, a clinical psychologist intern who met with K.M. in 1996 and 1997, poignantly recorded that K.M. expresses anger and fear toward N.M. for his own abuse and that endured by his younger brother, S.M. In stark contrast, she found that K.M.'s placement with his great grandmother provided him with a safe, nurturing, and stable place to develop. Meredith Knight, also a clinical psychologist intern who counseled K.M. in 1997 and 1998, mirrored Pellerin's observation of K.M.'s rage against his mother, and further questioned whether reunification with N.M. would not exacerbate the hurt he already had experienced. Elaine Spencer-Carver, a social worker who counseled S.M. from January through July of 1997, was also gravely concerned about OCS's reunification plan. She pointed out that S.M. had lived away from his mother for almost his entire life, except for the period when he was abused. In his foster home, his bowel and bladder problems improved significantly and, unlike the treatment he received in his mother's presence, his needs were met and his well being was nurtured. Finally, Ruth W. Landis, another social worker who interviewed N.M. and the children on numerous occasions in 1997 and early 1998, seriously questioned whether N.M., despite her seeming *452 cooperation, had the ability to care for her children and to carry through with the plan devised to return her children to her. Independently reaching the same recommendations Dr. York made better than a year earlier, Ms. Landis stressed that N.M. had to undergo intensive individual psychotherapy, a course of action she had voluntarily abandoned, to deal with her own problems and the needs and demands of her now four children. Ultimately, she clearly stated that the children's safety and sense of stability had to be the primary consideration of OCS in adopting its Permanency Placement Plan, and OCS's goal of reunification should be reassessed in that light.
The record now before us shows that there has been some cooperation by N.M. with OCS and the juvenile court's requirements. However, the evidence of record has not shown that N.M. has met the second prong of the test outlined in State in Interest of L.L.Z., namely that N.M. "has shown improvement." Id. at 1317. It is clear that she has not demonstrated that the behavior that led to the adjudication of dependency has been eliminated or significantly reduced, such that her three children are no longer at risk. Although it is evident from her statements that N.M. loves her children, her behavior belies her statements that her cooperation with the juvenile court's orders has led to her improvement sufficient to demonstrate that reunification is in the best interest of the three children. N.M. has maintained her same lifestyle. She has never established a residence of her own, choosing instead to live here and there with friends and acquaintances, and to change residences frequently. In addition, she has consistently and repeatedly entered into brief romantic and unstable relationships with men, even one immediately after these proceedings began; as a result, each of N.M.'s four children were fathered by different men, and as evidenced by the blood test results entered into the record, some of those men thought to have been the fathers were not. As a result of one of her romantic relationships, complications of pregnancy caused N.M. to quit the only job she ever had, thus exacerbating her inability to provide for her children and to secure an adequate home for them. Finally, although N.M. attended a parenting class as ordered by the juvenile court, by her own admission she learned nothing beneficial. Moreover, as graphically depicted in Karen Pellerin's report to the court, N.M. spanked K.M. during a supervised visit.
Such contact causes K.M. intense psychological distress, physiological reactivity, and he feels as if the abuse were reoccurring.... His mother's insensitivity to this issue is of great concern. It not only indicates that she has little understanding of the psychological effect of K.M.'s abuse, but also that she has few effective discipline skills. That his mother would spank him in the context of a supervised visit, causes great concern about how she [N.M.] is likely to respond to K.M. during more stressful situations.
More than simply protecting parental rights, our judicial system is required to protect the children's rights to thrive and survive. State in Interest of GA, 664 So.2d at 114 (citing State in Interest of JL, 93-352 (La.App. 3 Cir. 5/18/94), 636 So.2d 1186, 1192). Furthermore, a child has an interest in the termination of rights that prevent adoption and inhibit that child's establishment of secure, stable, long term, continuous family relationships. State in Interest of J.M., 702 So.2d at 50; State in Interest of T.S.B., 532 So.2d 866 (La.App. 4 Cir.1988), writ denied, 536 So.2d 1239 (La.1989). While the interest of a parent is protected in a termination proceeding by enforcing the procedural rules enacted to insure that parental rights are not thoughtlessly severed, those interests must ultimately yield to the paramount best interest of the children. See State in Interest of T.S.B., supra; State in Interest of S.A.D., 481 So.2d 191 (La.App. 1 Cir.1985); State in Interest of A.E., 448 So.2d 183 (La.App. 4 Cir.1984); State in Interest of Driscoll, 410 So.2d 255 (La.App. 4 Cir.1982). Our careful consideration of the record bears out N.M.'s inappropriate behavior patterns and actions, her continued inability to implement those skills after she had been exposed to the many resourceful programs offered for her benefit, her withdrawal from long term, individual psychotherapy, and the bleak picture the social workers and mental health professionals have painted for N.M.'s projected behavior should reunification *453 take place. The undisputed evidence indicates that N.M.'s behavior has not shown improvement. Record evidence notably absent was the requisite evidence which could justify a finding that there was an expectation of N.M.'s reformation in the foreseeable future. The juvenile court's conclusion to the contrary simply flies in the face of the record. We find the juvenile court thereby abused its discretion in accepting OCS's proposal for reunification in its Permanency Placement Plan. Accordingly, we remand this matter to the juvenile court for OCS to propose a new Permanency Placement Plan for these three children.[12]

EXPEDITIOUS HEARING
As recognized in Lehman v. Lycoming County Children's Serv.'s Agency, 458 U.S. 502, 513, 102 S.Ct. 3231, 3238, 73 L.Ed.2d 928 (1982), "[i]t is undisputed that children require secure, stable, long-term, continuous relationships with their parents or foster parents." Very little is "as detrimental to a child's sound development as uncertainty over whether he is to remain in his current `home,' under the care of his parents or foster parents, especially when such uncertainty is prolonged." Id., 458 U.S. at 513-14, 102 S.Ct. at 3238; see also In re J.M.P., 528 So.2d 1002, 1016-17; In Interest of CLS, 94-531 (La.App. 3 Cir. 11/2/94), 649 So.2d 532, 540. In keeping with this paramount interest of the child[ren], in 1997 our Children's Code enacted Article 1001.1 specifically mandating that any petition or proceeding filed or held under the provisions of the Children's Code be given priority. La.Ch.Code art. 1001.1 provides:
Any petition filed and any proceeding held under the provisions of this Title shall be given priority, to the extent practicable, over any other civil action before the court, except emergency proceedings for the protection of the child under Articles 617 through 627, or Domestic Abuse Assistance proceedings under Chapter 8 of Title XV. Any petition filed under the provisions of this Title shall be docketed immediately upon filing, and hearings shall be scheduled for the earliest dates practicable. (Emphasis added.)
Accordingly, this court in exercising its supervisory jurisdiction orders that this case shall proceed expeditiously and within the following time frames to the extent practicable: (1) the juvenile court shall hold a hearing and decide the issue of the Permanency Placement Plan and/or petition for the termination of N.M.'s parental rights and any related issue within twenty days after either or both of these proceedings is filed; (2) the juvenile court shall set the return day of the appeal, should one be requested, no more than fifteen days from the signing of a judgment or from the mailing of notice of the judgment if required; and (3) in this event, the court of appeal shall hear and decide an appeal taken from the juvenile court within sixty days of the lodging of the record on appeal.

DECREE
For the foregoing reasons, the judgments of the lower courts are reversed and set aside, and this case is remanded to the juvenile court for a new Permanency Placement Plan hearing and/or hearing on a petition for the involuntary termination of parental rights to be held expeditiously and in accordance with the time frame established herein.
REVERSED AND REMANDED WITH INSTRUCTIONS FOR EXPEDITIOUS TREATMENT.
VICTORY, J., concurs in the result.
NOTES
[*] Traylor, J., not on panel. Rule IV, Part 2, § 3.
[2] On January 12, 1996, Judge Anita Ganucheau first appointed Eugene W. Policastri to represent the three minor children; he served as their attorney at least until March 11, 1996. However, beginning on May 15, 1996, the record reflects that Ann Derbes Keller began representing the three minor children as their attorney and that she has continued to serve in that capacity until this time. Ms. Keller brings this writ on the children's behalf.
[3] Although N.M. believed that Keith Essex was the father of K.M., DNA analysis completed on June 18, 1996, showed that Mr. Essex was not K.M.'s father. Similarly, even though Lonjay Earlycutt believed that he was the father of S.M., DNA analysis done on March 26, 1996, showed that Mr. Earlycutt was not the father. To the contrary, N.M. testified that Shawn Davis was S.M.'s father. N.M. thought that Terence Sylvester was the father of J.M. Mr. Sylvester's whereabouts are not known. None of the fathers were financially supporting these children.
[4] N.M. pleaded guilty on July 19, 1996, and she was sentenced on October 22, 1996. Since we do not have a transcription of her colloquy at her guilty plea, we cannot state what factual basis was given in support of her plea. It appears that she pleaded guilty on the basis that she knew of her boyfriend's abuse of the children, but she failed to do anything to prevent the abuse.
[5] The record fails to show any particulars on Johnson's conviction(s) and the details of his sentencing.
[6] N.M. became pregnant within one month of her release from prison, shortly after she attended the first review hearing in juvenile court on November 14, 1996. She gave birth to a daughter, J.N.M., in October of 1997. The custody of J.N.M. is not at issue in the present litigation.
[7] Pursuant to La.Ch.Code art. 424, the juvenile court appointed a CASA (Court-appointed special advocate) volunteer to assist in fulfilling its duties and responsibilities to the three minor children.
[8] We note that in essence reunification as a permanent placement of the child is the obverse of the termination of parental rights. Thus, it is evident that the jurisprudence which has approved and disproved the termination of parental rights is appropriately the wellspring for the formulation of our present inquiry.
[9] Now see La.Ch.Code art. 1036, effective August 15, 1997, which attempts to clarify the word, "reformation."
[10] At this time, we observe that the L.L.Z. decision addressed whether the mother was unfit and whether there was no reasonable expectation of reformation on her part. We note that under our treatment of the issue of whether the mother was "unfit to retain parental control," we found that the record was void of evidence to substantiate the State's claim in its petition for termination that the mother refused to provide food, clothing, and shelter to her child. Nevertheless, in addressing the reformation issue, we specifically showed that although food, clothing and shelter may have initially been part of the basis for removing the child from parental control, the case worker specifically stated that the mother cooperated with recommendations in this regard and had improved in her delivery of these necessities to her child.
[11] Although some of the social workers' reports occurred after the juvenile court hearing, the appellate court ordered the record supplemented. We have considered them in our disposition, finding that although some of the reports were not available to the juvenile court, they are nevertheless consistent with the recommendations these health professionals asserted at the time of the Permanency Placement Plan hearing.
[12] Had this evidence been before us in an action for the involuntary termination of N.M.'s parental rights at this time, we would have found the record more than sufficient to meet the State's burden of proof. Nevertheless, we note that with the lapse of time since the Permanency Placement Planning hearing in the juvenile court, evidence of N.M.'s reformation may be different by the time that this matter has returned to juvenile court. If not, then pursuant to the changes to the Children's Code which became effective on August 15, 1997, and will be applicable to this case upon remand to the juvenile court, either the juvenile court, the State, or counsel for the children may commence an action for involuntary termination of N.M.'s parental rights. La. Ch.Codeart. 1004.