STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

07-1442 consolidated with 07-1441

STATE IN THE INTEREST OF C.W.

**********
APPEAL FROM THE
THIRTIETH JUDICIAL DISTRICT COURT
PARISH OF VERNON, NO. J-1556-05 CONSOLIDATED
HONORABLE LESTER P. KEES, DISTRICT JUDGE

**********

ULYSSES GENE THIBODEAUX
CHIEF JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Oswald A. Decuir, and
Glenn B. Gremillion, Judges.

AFFIRMED.

Robert J. Elliott
Louisiana Department of Social Services
P. O. Box 832
Alexandria, LA 71309-0832
Telephone: (318) 487-5218
COUNSEL FOR:
    Appellant - State of Louisiana, Department of Social Services

Jack L. Simms, Jr.
P. O. Box 1554
Leesville, LA 71446
Telephone: (337) 238-9393
COUNSEL FOR:
    Appellee - B.M.W.

Tony Clell Tillman
Tillman, Fontenot
P. O. Drawer 648
Leesville, LA 71496-0648
Telephone: (337) 239-7983
COUNSEL FOR:
    Appellee - C.A.W.

**David James Klann**
**607 South 5th Street**
**Leesville, LA 71446**
**Telephone:  (337) 239-6709**
**COUNSEL FOR:**
   **Appellee - B.C.W.**

**THIBODEAUX, Chief Judge.**

In this consolidated action, plaintiff-appellant, the Louisiana Department of Social Services (the Department), seeks a reversal of the trial court's judgment, denying its petition to terminate the parental rights of the defendant-appellee, B.C.W., to her two minor children. The Department asserted La.Ch.Code art. 1015(5) as the ground for termination; however, the trial court found that the Department did not prove that the mother failed to substantially comply with the case plan for the safe return of the children, as required by Article 1015(5). For the following reasons, we affirm.

I.

**ISSUE**

Did the facts presented by the Department establish B.C.W.'s lack of substantial compliance with the court-approved case plan for the safe return of her children?

II.

**FACTUAL BACKGROUND**

The minor children, C.A.W. and C.M.W., were both removed from their parents' care as infants. C.A.W., the male child and the oldest sibling, was born to the teenagers, B.C.W. (the mother) and B.M.W. (the father), on December 27, 2004. B.C.W. was sixteen-years-old when she gave birth to her son. The father, B.M.W., was eighteen at the time of this child's birth. The child was conceived shortly after the couple met and began dating while in high school.

B.M.W. graduated from high school, enlisted in the United States Army, and married B.C.W. in May of 2004. A few weeks later, he reported to basic training in another state. The marriage between B.C.W. and B.M.W. was unstable from the beginning and remained so over the next few years, which included B.C.W.'s

subsequent allegations of domestic abuse. Within a few months, the couple considered themselves separated; B.M.W. declared that he wanted a divorce. However, after B.M.W. completed basic training and was stationed to work at Fort Polk, Louisiana, the couple soon reconciled. They began living together, for the first time, in January 2005; C.A.W. was approximately one month old.

On May 15, 2005, injuries to C.A.W. were first identified when he was taken by his parents to a hospital in St. Tammany Parish; the family was in St. Tammany visiting B.C.W.'s parents. An X-ray revealed a skull fracture and large hematoma, but there was no damage to the brain detected, and no other injuries were found. The parents denied injuring the child and told hospital personnel and local Department authorities that they believed the child must have been injured in his car seat, while they traveled to St. Tammany Parish. They claimed that they were in a near accident, resulting in B.M.W. having to forcefully apply the car's brakes. The parents explained that the child may have injured his head in the car seat as a result. C.A.W. remained in his parents' care.

On June 20, 2005, when C.A.W. was six months old, the Department was again notified of possible physical abuse of C.A.W. The person reporting the suspected abuse informed the Department that the father had gotten upset and shaken the baby during the past weekend and that the mother had admitted to witnessing the father pinch and shake the baby in the past. An investigation was launched, and on June 21, 2005, a hospital evaluation of the infant revealed five fractured ribs. A subsequent review of the X-rays taken in May when the baby was evaluated for the head injury revealed that the rib fractures had been present then but were undetected. On June 21, 2005, the department sought C.A.W.'s removal on the basis of alleged physical abuse by the father and alleged passive abuse by the mother. C.A.W. was

successfully removed from his parents' custody and placed in the care, custody, and control of the Department pursuant to an Instanter Order issued by the trial court.

On June 27, 2005, the father confessed to the suspected physical abuse. The confession was given to the Army Criminal Investigation Division, which had launched an investigation of the child abuse allegations. B.M.W. provided a signed and witnessed, sworn statement, admitting to committing multiple acts of physical abuse on his infant son. Although he had confessed to the abuse, B.M.W. and his wife continued to live together on the military base while awaiting his anticipated court martial. The Department's case worker described B.C.W. as remaining supportive of her husband at that time.

In the meantime, the Department scheduled psychological evaluations for both B.M.W. and B.C.W., and the court-approved case plan that had been developed, with reunification of the child with the parents as the permanent placement goal, continued to be worked by both parents. The plan consisted of the parents' regular supervised visitation with C.A.W. and required the parents to undergo counseling and participate in parenting classes. Anger management classes were recommended for B.M.W. The case plan was scheduled to be reviewed in November.

At the parents' initial psychological evaluations with clinical psychologist, Dr. John Simoneaux, it was determined that visitation between C.A.W. and the father should be stopped. During this evaluation, which took place on July 15, 2005, B.M.W. confessed, again, to causing the injuries to his son. In addition, a Department case worker arrived with C.A.W. for a supervised visit with his parents, which allowed Dr. Simoneaux to witness the interaction between C.A.W. (who was then about seven months old) and his parents. Dr. Simoneaux observed C.A.W.

3

"scream" every time the father approached. Dr. Simoneaux later described this as a "conditioned aversion" to the father as a result of his past negative interactions with him. The child was not agitated in his mother's presence, however. Dr. Simoneaux advised the Department worker that visitation with the father should be stopped immediately. Also, in a report issued that day, Dr. Simoneaux advised the Department that based on his interaction with, and clinical examination of, the father, he saw no justification for anything other than the pursuit of criminal charges against B.M.W. and the pursuit of termination of his parental rights.

Dr. Simoneaux opined that B.M.W. was "obviously a very dangerous presence around the child," had "poor impulse control," and had "virtually no insight" into the seriousness of his behaviors. B.M.W. described his infliction of injuries on the child in an emotionless, matter-of-fact manner, and Dr. Simoneaux ultimately opined that B.M.W.'s behaviors were not the result of mental illness, but were the result of characterological/personality-based issues that were not likely treatable. Dr. Simoneaux also stated in his report that because B.M.W. attributed his abuse of his son to "stress" in his life, i.e., finances, sick wife, work, and in-laws, there was an increased risk of abuse present, since none of these issues had been resolved. Rather, the situation was more precarious, in his opinion, because of the added stress brought on by the current investigation and likely criminal proceedings.

Dr. Simoneaux further advised the Department that his evaluation and interview of B.C.W. revealed that she was equally oblivious to the seriousness of the harm caused and, as a result, was not capable of protecting the child from the father. Dr. Simoneaux issued a written report that day to the foster care worker assigned to the case, Catherine Weinnig, memorializing his impressions of the adults and the situation, in part, as follows:

4

- [B.C.W.] [17 years old] is immature, insightless and confused. She would not be able to protect any child from [B.C.W.] if he is of a mind to impose himself on her.

- [B.C.W.] is defensive, intellectually dull, immature, and dangerous. While he admits to hurting the child, he is nowhere near being able to understand or accept the implications of his behaviors.

- The child is obviously still very frightened in [B.M.W.'s] presence and is traumatized by the conflict.

Dr. Simoneaux also stated his distress regarding the Army's pace with the investigation and prosecution of B.M.W., but he urged the Department to take further action to protect the child in what he deemed to be a "serious" child abuse case. He, again, urged that the Department immediately cease any visitation between the child and B.M.W. and that the wife be instructed that any informal contact with B.M.W. would be suggestive of her support of him and indicative of her inability to protect her child. Dr. Simoneaux believed that the fact that B.M.W. remained free and uncharged of any crime(s) and that he was permitted visitation with the child, likely affected B.C.W.'s ability to understand the seriousness of the harm done. He did not view B.C.W. as being at risk for inflicting physical abuse on C.A.W. but believed that she was at risk for committing abuse in the form of neglect. He encouraged continued, supervised visitation with the mother.

Accordingly, in August of 2005, the Department filed a Motion and Order for Reunification Efforts Determination, seeking a hearing date during which B.M.W. would show cause why permanent reunification efforts between him and the child were unnecessary, pursuant to La.Ch.Code art. 672.1(c)[1]. A permanent

---

[1]**Art. 672.1. Reunification efforts determination**

A. At any time in a child in need of care proceeding when a child is in the custody of the department, the department may file a motion for a judicial determination that efforts to reunify the parent

placement plan of reunification with the mother would be continued. A contradictory hearing on this issue was held in October but was recessed to allow B.M.W. time to obtain a separate and independent psychological evaluation. On November 12, 2005, the independent psychological evaluation of B.M.W. was performed. That psychologist opined that any children in B.M.W.'s care would be at risk for abuse and neglect.

By the time this psychological evaluation had been performed, B.M.W. was no longer living with his wife in the family's two-bedroom military home on the base. In mid-October he moved to the military barracks on the base, due to the urgings of B.C.W.'s attorney and Dr. Simoneaux, who believed that this was a necessary step in order for B.C.W. to successfully work towards regaining custody of her son. The case worker noted in her records, however, that B.C.W. continued to view the situation as unfair and felt that she was being forced into a divorce. The

and child are not required.

B. The department shall have the burden of demonstrating by clear and convincing evidence that reunification efforts are not required, considering the health and safety of the child and the child's need for permanency.

C. Efforts to reunify the parent and child are not required if a court of competent jurisdiction has determined that:

(1) The parent has subjected the child to egregious conduct or conditions, including but not limited to any of the grounds for certification for adoption pursuant to Article 1015.

(2) The parent has committed murder or manslaughter of another child of the parent or has aided or abetted, attempted, conspired, or solicited to commit such a murder or manslaughter.

(3) The parent has committed a felony that results in serious bodily injury to the child or another child of the parent.

(4) The parental rights of the parent to a sibling have been terminated involuntarily.

D. If the court determines that reunification efforts are not required, it shall document that determination by written findings of fact. A permanency hearing may be conducted immediately and shall be conducted within thirty days after the determination.

facts also notably reveal that B.C.W. remained very dependent upon her husband at this time for her practical everyday needs. At this time, she was still not yet eighteen years old, was approximately eight months pregnant with the couple's second child, did not have a driver's license, and was unemployed.

B.C.W. later contradicted Ms. Weinnig's opinion of her relationship with B.M.W. at that time. She testified that she wanted B.M.W. to move out but was afraid of him and was dependent on him; she had nowhere else to go, she testified. She further testified that he was controlling and threatening, and although he was eventually restricted from going to her house on the base, unescorted, he would still harass her by coming to the house and making excessive telephone calls. She also claimed he would "break in" when she was not home.

The couple's second child, a daughter, C.M.W., was born on November 27, 2005, about a month after B.M.W. had moved out of the home. She was removed from her parents' custody, pursuant to an Instanter Order, two days after her birth, because of her father's presence at the hospital during and after her birth. The Department was notified by the hospital that the father was present and had remained in the mother's hospital room since the child's birth.

Kerri Blackwell, an employee of the Department's Vernon Parish Office of Community Services (OCS), filed the affidavit offered in support of the Instanter Order that was sought to remove C.M.W. from her parents' custody. She averred in the affidavit that on November 29, 2005, she received a report of alleged neglect concerning the newborn. Specifically, the reporter was "concerned about [B.C.W.'s] ability to care for and protect the infant based on the family's history with the agency." The affiant also stated that when the parents were subsequently interviewed at the hospital, they expressed defiance regarding the recommendation that B.M.W.

7

not be around this child as well. She attested that they both expressed a concern that the father, B.M.W., was "being treated unfairly and they did not understand why [he] had to be supervised around the newborn because he had not injured this child." The reporter also alleged that B.C.W. made comments about not being able to care for the child alone and cried when B.M.W. attempted to leave the hospital overnight. Ultimately, the Department alleged that "[d]ue to the attitude of the parents, and their inability and/or unwillingness to acknowledge that the child would be at risk if left alone unattended with her father" an Instanter Order for the infant's removal from their custody was obtained.

B.C.W. testified that the Department was incorrect about her desire to have B.M.W. present when she gave birth to their daughter. She said that she did not want him there and does not know how he was informed that she had gone to the hospital to deliver the baby, since she did not tell him (they were not living together at the time). In addition, when he showed up, she claimed to have told him to leave because the Department would take their daughter if he was there. She claims that he would not leave, that she was afraid of him and did not talk to him while he was present. She testified that when he arrived at the hospital, she advised the nurses about the Department's removal of C.A.W. due to the abuse allegations.

In January of 2006, the Department moved to consolidate the matters involving the minor children, C.A.W. and C.M.W., and moved for an order stating that reunification efforts between the father and the second child, C.M.W., were not necessary; the similar order regarding C.A.W. was still pending. The matters were consolidated, but the hearing was subsequently continued.

At the May case plan review meeting, it was determined that the goal of reunification of the children with the mother should also be abandoned due to lack

8

of progress. The children were both still in foster care. C.A.W. had been in the Department's custody for over one year. Although C.M.W. had been in the Department custody for less than one year, it was determined that it would be in the child's best interest to free her for adoption as well. At the time, the father was facing a court-martial and jail time, and the mother had not yet acquired stable housing or consistent employment and transportation. In addition, the case worker who visited the mother's homes and supervised visitation between her and the children remained dissatisfied with B.C.W.'s efforts to prove that she could safely and adequately provide a home and care for the children. She specifically reported that B.C.W. continued to display poor childcare and housekeeping skills. She also found B.C.W.'s romantic involvements unstable and problematic. It was recommended that the permanent placement plan be changed to the goal of freeing the children for adoption.

The court approved the Department's recommendation, and the Department filed a Petition for Termination of Parental Rights and Certification of Minor Children for Adoption on June 26, 2006. It was alleged that B.C.W.'s parental rights should be terminated pursuant to the grounds set forth in La.Ch.Code art. 1015(5)[2] and that B.M.W.'s parental rights should be terminated pursuant to those

_____

[2]Children's Code article 1015(5) states:

> The grounds for termination of parental rights are:
>
> . . . .
>
> (5) Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

grounds set forth in La.Ch.Code art. 1015(3)[3] and (5). The petition stated that termination was justified because of the parents' failure "at any and all efforts of rehabilitation and/or . . . fail[ure] to successfully comply, complete, and successfully work, their respective individual case plans, . . ." The Department also alleged that there was "no reasonable expectation that either will significantly improve in their respective condition, conduct[,] or behavior within the near future, considering the

---

[3]Children's Code article 1015(3) states:

. . . .

(3) Misconduct of the parent toward this child or any other child of the parent or any other child in his household which constitutes extreme abuse, cruel and inhuman treatment, or grossly negligent behavior below a reasonable standard of human decency, including but not limited to the conviction, commission, aiding or abetting, attempting, conspiring, or soliciting to commit any of the following:

(a) Murder.

(b) Unjustified intentional killing.

(c) Aggravated incest.

(d) Rape.

(e) Sodomy.

(f) Torture.

(g) Starvation.

(h) A felony that has resulted in serious bodily injury.

(i) Abuse or neglect which is chronic, life threatening, or results in gravely disabling physical or psychological injury or disfigurement.

(j) Abuse or neglect after the child is returned to the parent's care and custody while under department supervision, when the child had previously been removed for his safety from the parent pursuant to a disposition judgment in a child in need of care proceeding.

(k) The parent's parental rights to one or more of the child's siblings have been terminated due to neglect or abuse and prior attempts to rehabilitate the parent have been unsuccessful.

(l) Sexual abuse, which shall include, but is not limited to acts which are prohibited by R.S. 14:43.1, 43.2, 80, 81, 81.1, 81.2, 89 and 89.1.

age of the minor children and said children's need for a safe, stable[,] and permanent home."

The trial court terminated B.M.W.'s parental rights to both children;[4] however, the trial court denied the Department's request to terminate the parental rights of the mother, B.C.W. The trial court stated that the Department had failed to establish that there was no substantial compliance with the case plan by the mother, pursuant to La.Ch.Code art. 1015(5). The children were continued in the care of the Department until further order of the court. The Department has appealed the trial court's denial of the request to terminate the mother's parental rights.

III.

## LAW AND ANALYSIS

The review of involuntary termination of parental rights rulings is governed by the manifest error standard. *State in the Interest of K.G. & T.G.*, 02-2886, 02-2892 (La. 3/18/03), 841 so.2d 759. This review requires a determination of whether the trial court's decision to deny the involuntary termination of B.C.W.'s parental rights to her two children was reasonably supported by the facts and evidence presented. In this case, the Department was seeking to terminate B.C.W.'s parental rights on the basis of the grounds set forth in La.Ch.Code art. 1015(5), which requires that three conditions be established: (1) unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody; (2) there has been no substantial parental compliance with a case plan for services; and, (3) there is no reasonable expectation of significant improvement in the

---

[4]B.M.W. was court-martialed and pled guilty on September 18, 2006, to two counts of assault on a child under the age of sixteen. He was sentenced to four years confinement and at the time of the parental rights termination hearing, was incarcerated at a military prison facility at Fort Sill, Oklahoma. He was allowed to be present for the termination hearing.)

parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

"[T]ermination of parental rights, except when the petition alleges certain criminal or grossly negligent conduct, requires proof by clear and convincing evidence." *State in the Interest of S.D., C.D., B.D., M.D., & C.D. v. Moore*, 31,192, p. 3 (La.App. 2 Cir. 8/19/98), 717 So.2d 265, 267. The fundamental purpose of involuntary termination proceedings is to provide the greatest possible protection to a child whose parents are unwilling or unable to provide the physical, emotional, and mental care needed for adequate child-rearing. *State in the Interest of J.A.*, 99-2905 (La. 1/12/00), 752 So.2d 806. However, in such proceedings, there are two private interests that must be balanced: 1) the parents' "natural, fundamental liberty interest to the continuing companionship, care, custody, and management of their children;" and 2) the child's "profound interest, often at odds with those of his parents, in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, and continuous relationships found in a home with proper parental care." *Id*. at 810-11. The child's interest is deemed superior to that of the parents in courts of this State. *Id*. (citations omitted). The primary focus of such proceedings should be, consequently, whether it is in the best interest of the child for all legal relations with the parent to be terminated and not whether the parent should be deprived of custody. *Id*.

The supreme court in *State in the Interest of L.L.Z. v. M.Y.S.*, 620 So.2d 1309 (La.1993), established the test for evaluating whether reunification is a viable option to termination of parental rights. The court stated that reunification efforts may be justified if "a reasonable expectation of reformation is found." *Id*. at 1317. A reasonable expectation of reformation may exist "if the parent has cooperated with

state officials and has shown improvement, although all of the problems that exist have not been eliminated." *Id.* The supreme court has acknowledged that a "significant, substantial indication of reformation . . . such as altering or modifying in a significant way the behavior which served as a basis for the state's removal of a child from the home," should be evident. *State in Interest of S.M.*, 98-922, p. 10 (La. 10/20/98), 719 So.2d 445, 450 (citations omitted). The supreme court recognized that it is not enough, by itself, for "[a] parent [to] profess[] an intention to exercise his or her parental rights and responsibilities." *Id.* He or she also "must take some action in furtherance of th[is] intention to avoid having those rights terminated." *Id.* (citations omitted).

As of the date of the August 2007 termination hearing, the children had been in the care and custody of the Department for 26 months (C.A.W.) and 21 months (C.M.W.), respectively. Consequently, the first condition for termination of B.C.W.'s parental rights under Article 1015(5) was satisfied by the facts of this case. The court, however, found that the Department failed to prove that the second condition, lack of substantial compliance with the case plan, had occurred in this case. We agree.

**Substantial Compliance with the Case Plan**

The Department argues in its brief that B.C.W.'s lack of substantial compliance with the case plan was established at the termination hearing by the testimony of foster care worker, Ms. Weinnig; Licensed Professional Counselor, Ms. Therri Theaux; and Dr. Simoneaux.

Ms. Weinnig stated that the case plan for reunification required B.C.W. to exhibit her independent capability of providing a safe and healthy home environment for her children. To do so, she was required to establish independent

13

housing separate from her husband; demonstrate that she could provide a safe, adequate, and stable home for her children; and develop a budget that would show her capability of maintaining a home. She was required to demonstrate adequate parenting, which included developing a protective plan to keep C.A.W. safe from harm; enrolling in, and successfully completing, parenting classes and being able to demonstrate what she learned. B.C.W. was also required to attend therapy sessions with Ms. Theaux and demonstrate progress; maintain visitation with her children according to the case plan; pay any court-ordered child support; and submit to psychological assessments by Dr. Simoneaux and adhere to his recommendations.

Ms. Weinnig testified that B.C.W. never developed a protective plan for C.A.W., never paid the child support ordered in February 2007, and never fully developed a home budget. In addition, she testified that C.A.W. consistently failed to establish and maintain a stable and safe home environment for the children as required by the case plan.

According to Ms. Weinnig, the failure to establish a suitable home was evidenced by B.C.W.'s eviction from her apartment in January 2007, for failure to pay rent for two months. B.C.W., in turn, testified that she lost the apartment because she did not have the money for the full amount of the rent that was due. She had been dependent upon additional money sent either from the military or her husband, which stopped shortly after he was jailed in September 2006.

Ms. Weinnig further noted that while B.C.W. was living in her apartment, prior to being evicted, her home environment was not safe or suitable for children for a number of reasons. She focused heavily on B.C.W.'s apparent romantic involvements. She listed as an example B.C.W.'s decision to allow a boyfriend to live with her in late 2006. She expressed disapproval of B.C.W.'s decision, noting

that the relationship was plagued with conflict. Ultimately, the relationship ended after a domestic dispute that resulted in B.C.W. reporting to the police that he had threatened her. After he moved out, Ms. Weinnig testified that she later visited the apartment in November and December and witnessed, on separate occasions, two different males living there. B.C.W. did not deny this but claimed that these men were just friends needing a place to stay for a short while.

Ms. Weinnig also found it significant that in January 2007, while the eviction process was pending, B.C.W. traveled to Boston to reconcile with her former live-in boyfriend. Ms. Weinnig also thought it notable that B.C.W. failed to return to remove her property from the apartment, and as a result, lost furnishings and most of her other personal belongings. She added that B.C.W. failed to immediately secure other living arrangements or to notify the Department of a new address or her plans.

When B.C.W. returned to Louisiana, in March 2007, she lived with friends for a short period of time, then she and her boyfriend moved into her parents' apartment in Baton Rouge. They remained there for less than a month before being asked to leave, seemingly due to conflict over monetary contributions to the household. They then moved in with B.C.W.'s grandparents in Covington.

According to Ms. Weinnig, this condition of being without a stable, safe home environment for the children continued as of the date of the termination hearing at issue (August 2007). Although B.C.W. was no longer in a relationship, she continued to live with her grandparents in their three-bedroom, two-bath trailer home; she had been there for eight months. Although she advised the court that she did not plan to live there indefinitely, she offered no anticipated move date or housing options for herself and her children, other than her grandparents' home or her parents' home. B.C.W. testified that the home was very clean and had accommodations for

15

the children. Neither of these homes had been evaluated for suitability for the children to live in with their mother at the time of the hearing.

The Department offered further testimony regarding B.C.W.'s failure to provide a safe and clean home environment for the children, by offering testimony regarding conditions witnessed in the apartment that B.C.W. lived in, in late 2006, prior to being evicted. Ms. Weinnig testified that B.C.W. lived with pets and that she witnessed on multiple occasions that there were pet droppings on the floor and that the home was not suitably clean. In addition, Ms. Weinnig witnessed sharp objects accessible by the children and small "BB" gun pellets on the floor of the home when the children were present. Ms. Weinnig stated that B.C.W. cleaned up these conditions only after they were brought to her attention.

Dr. Simoneaux's testimony focused on his psychological evaluations of B.C.W. He opined that she remained incapable of providing suitable care for her children as of the date of the termination hearing or in the near future. He based his opinions on impressions of B.C.W. developed from his three evaluations of her—approximately one per year, since 2005. He testified at the hearing that it was his belief at his initial meeting with her (she was seventeen) that she was "very young, very impressionable, very immature, and very dependent." He found that her "reality-testing" seemed questionable because she did not seem to process information correctly. Because of her initial, extreme dependency upon her husband, he felt that her danger to the children was probable passive abuse in the form of neglect, and recommended individual therapy for her, in addition to parenting and bonding classes.

Dr. Simoneaux further testified that he anticipated that therapy and maturity would cure many of these issues, but upon repeating his clinical testing and

interviewing of her a year later, in 2006, he found that no progress had been made. Consequently, he again recommended continued therapy and supervised visitation between her and the children. He remained concerned, at that time, about her failure to fully acknowledge or accept B.M.W.'s guilt and opined that, if the opportunity arose, she might resume a relationship with him, which would have been unsafe for her children.

In July of 2007, a month prior to the hearing, Dr. Simoneaux testified that he performed standardized clinical testing and interviewed B.C.W. for the third time. He formed similar opinions about B.C.W., who by then, was eighteen years old. He observed that she continued to exhibit severe dependency issues, which he believed were evident by her unstable living situations and a continuing lack of insight into the true instability of her life and the seriousness of the risk of losing her children. Dr. Simoneaux testified that her social history indicated "very poor judgment," such as her 2006 and early 2007 involvement with a "live-in" with a poor parenting history himself (he had a child out-of-wedlock whom he was not regularly providing for or visiting), and her consideration of reconciling with her husband after he unequivocally admitted to committing "near-death" abuse to C.A.W. He further advised that he considered her behavior over the last few years to be examples of her characterological narcissism, which is difficult to resolve.

However, Dr. Simoneaux added a caveat to his testimony. He stated that he also believed that B.C.W.'s young age and immaturity were factors in her behavior and that he could not discount the possibility that, over time, she could become a suitable parent. He could not project that it would be necessary to remove from her care any other children that she might have in the future. However, Dr. Simoneaux

17

testified that he did not consider that such changes were possible in the near future, i.e., the next few months or year.

Counselor Therri Theaux testified on behalf of the Department as well, in support of its efforts to terminate B.C.W.'s parental rights to her two children. She was accepted by the court as an expert in the field of mental health counseling, with specific expertise in abused and neglected children. Ms. Theaux testified that she visited B.C.W. and the children ten times in 2006, once a week over an eight-month period. Her job was to provide the follow-up therapy recommended by Dr. Simoneaux and made a part of the case plan. The goals of the therapy were to assist B.C.W. in gaining insight into her dependent and narcissistic personality traits and lifestyle and to gain maturity as an individual and a parent. These efforts were to assist B.C.W. in overcoming some of the characterological problems that Dr. Simoneaux believed were interfering with her life's development and child-rearing abilities.

Ms. Theaux testified that she saw B.C.W.'s narcissistic traits, identified by Dr. Simoneaux, become more ingrained over time and had little success in getting her to shift the focus off of herself to her children. She ultimately ended her therapy sessions with B.C.W. because of the lack of improvement and what she perceived as B.C.W.'s "lack of interest" in improving. She stated that B.C.W. believed that because B.M.W. had caused the injury to their child, once he was out of her life, the Department should not have been concerned with her, and the children should have been returned.

Ms. Theaux testified that she observed the home visits that allowed for interactions between B.C.W. and the children and saw that B.C.W. remained overwhelmed by, and unable to manage, the two children. She explained that these

deficiencies were evidenced by B.C.W.'s failure to understand how to bathe, how to properly feed, or how to get them safely buckled into their car seats. She also claimed that B.C.W. could not monitor one child, while performing an activity with the other, such as diapering.

Finally, Ms. Theaux testified that B.C.W. continued to display poor decision-making skills when it came to meeting the needs of the children and that B.C.W. continued to remain improperly dependent on, and expectant of, others to provide care for her children. She offered as examples, B.C.W.'s consistent failure to bring snacks or diapers, or a sufficient amount, to visits with the children, even though she was aware that she was expected to do so. She also witnessed B.C.W. express irritation and anger when the foster parents or the Department did not provide these items.

Ms. Theaux also expressed concern that B.C.W. exhibited a pattern of choosing mates poorly. She testified that B.C.W. reported domestic violence, while living with her husband; however, she subsequently picked a partner who also exhibited violence towards her and from whom she had difficulty breaking away without there being a threat of harm to herself. Ms. Theaux said this type of violence in relationships presented a correlative threat to the children.

Testimony was also provided on B.C.W.'s behalf. It was established that B.C.W. had obtained her G.E.D. and a driver's license and had attended all of her required parenting classes and therapy sessions, as required by her case plan. The parenting classes did not offer hands on, practical care tips for raising infants and toddlers, however, and was more geared towards child-rearing issues faced with older children, according to Beth Bratcher, the programs specialist who taught the classes attended by B.C.W. B.C.W. testified that the instances of difficulty in providing care

for the two children at once were due to her inexperience in handling the children together; she expressed a desire to have the opportunity to provide more care for them.

Although B.C.W.'s employment history was unstable, it was uncontradicted that B.C.W. worked at various jobs over the course of the two years that her children were in Department custody. Ms. Theaux opined that B.C.W. could not maintain jobs due to her lack of foresight and planning, regarding pay rate, hours that would be expected of her, and how much childcare would be needed. B.C.W. did not contradict this, but testified that she has had difficulty finding and keeping jobs due to her lack of education, lack of experience, and lack of transportation. She testified at trial that she had recently purchased a car and had acquired a job with a tire company in Covington. By all accounts, B.C.W.'s longest period of employment was eight-months, as a salesperson for a vacuum cleaner company in 2006.

B.C.W. testified that she had been living with her grandparents in their three-bedroom, two-bathroom home for the past eight months. B.C.W. claimed that if the children were returned to her, she would move in with her parents in their Baton Rouge home so that she could attend community college there and that they would assist in providing childcare for the children. At the time of the hearing, the Department had not evaluated the suitability of the grandparents' or the parents' living environments.

B.C.W. also testified that she had long wanted a divorce from B.M.W. but simply has not been able to afford it. She acknowledged to the trial court her understanding that B.M.W. had "almost killed" her son and asked that she not be punished for what he had done. She claimed to have been frightened of B.M.W. throughout their marriage because of his temper and threats. She denied that any

20

physical abuse was inflicted upon her by him, but admits that she was very dependent upon him because of his manner of controlling her, e.g., he would not allow her to get a driver's license. In addition, she did not have anywhere else to live and did not have a job. B.C.W. admitted that in some aspects her progress had been minimal and acknowledged that she had a lot of "growing-up" to do, but expressed her desire that her parental rights not be terminated.

Based on our review of the record and the pertinent facts presented, we cannot say that the trial court erred in denying the petition to terminate the parental rights of B.C.W. to her children, C.A.W. and C.S.W. Its conclusion that the Department failed to prove lack of substantial compliance with the case plan is reasonably supported by the record.

IV.

**CONCLUSION**

The judgment of the trial court, denying the petition to involuntarily terminate the parental rights of B.C.W. to C.A.W. and C.S.W., is affirmed.

**AFFIRMED.**

21