NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

14-1044

STATE IN THE INTEREST OF J.C.

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF VERMILION, NO. 2011-JU-96
HONORABLE DURWOOD W. CONQUE, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

JIMMIE C. PETERS
JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Jimmie C. Peters, Marc T. Amy, and Elizabeth A. Pickett, Judges.

MOTION TO STRIKE DENIED; AFFIRMED.

**Tracey Davenport-McGraw**
**Public Defender's Office**
**Fifteenth Judicial District**
**204 Charity Street**
**Abbeville, LA 70510**
**(337) 257-4669**
**COUNSEL FOR APPELLANT:**
**C.C. (mother)**

**Tamara D. Rahim**
**825 Kaliste Saloom Road**
**Brandywine 3, Room 150**
**Lafayette, LA 70508**
**(337) 262-1555**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana Department of Children and Family Services**

**Franchesca L. Hamilton-Acker**
**Acadiana Legal Service Corp.**
**Post Office Box 4823**
**Lafayette, LA 70502-4823**
**(337) 237-4320**
**COUNSEL FOR APPELLEE:**
    **J.C. (child)**

**PETERS, J.**

C.C.[1] appeals a trial court judgment terminating her parental rights to her minor child, J.C., and certifying the child as available for adoption.[2] For the following reasons, we affirm the trial court judgment in all respects.

## DISCUSSION OF THE RECORD

The minor child at issue in this proceeding is J.C., who was born on June 10, 2012. J.C. came into the custody of the State of Louisiana, Department of Children and Family Services (DCFS) on November 28, 2012, based on a report that C.C. had been sexually and physically assaulted by a neighbor. Based on a fear for J.C.'s safety, and because two of C.C.'s other children were already in DCFS's custody, DCFS obtained an instanter custody order. In the affidavit filed in support of the instanter custody order, DCFS asserted that it had been supervising C.C. since September of 2011, when the other two children came in to its custody; that C.C. had not complied with the case plan for those two children; that she suffers from depression and anxiety; that she had moved ten times since September of 2011; and that she was currently "using illicit substances" including marijuana, benzodiazepines, and cocaine.

At a February 4, 2013 hearing, and with the stipulation of the mother, the trial court adjudicated J.C. a child in need of care (CINC) and approved a February 1, 2013 case plan. This was the first of five case plans filed in these proceeding addressing J.C.[3] The dates of these case plans are as follows:

---

[1] Pursuant to Uniform Rules—Courts of Appeal, Rules 5-1 and 5-2, the initials of the parties will be used to protect and maintain the privacy of the minor children involved in this proceeding.

[2] The judgment also terminated the paternal rights of J.H., J.C.'s father. However, J.H. did not oppose the termination proceedings and did not appeal the trial court judgment.

- February 1, 2013
- May 6, 2013
- August 12, 2013
- February 7, 2014
- August 4, 2014

These case plans were considered at a number of permanency and review hearings

held on the following dates:

- February 4, 2013
- March 6, 2013
- July 22, 2013
- September 16, 2013
- February 24, 2014
- August 8, 2014

At each of these hearings, the trial court approved the case plans presented and

C.C. stipulated that J.C.'s custody should remain with DCFS.

On July 8, 2014, DCFS filed a petition to terminate C.C.'s parental rights as

to J.C. and to have J.C. certified as eligible for adoption. After an August 25, 2014

hearing, the trial court terminated her parental rights and certified J.C. as eligible

for adoption. After the trial court executed a September 2, 2014 judgment

corresponding to its reasons for judgment, C.C. perfected this appeal, asserting two

assignments of error:

1. The Trial Court erred in finding that the Department proved by clear and convincing evidence that C.C. had not substantially complied with her case plan; and that there was no reasonable expectation for further improvement in the near future.

2. The Trial Court erred in finding that termination of C.C.'s parental rights was in the best interest of her child, where the Department failed to prove by clear and convincing evidence that she had not substantially complied with her case plan and there was no reasonable expectation of further improvement.

---

[3] Some of the case plans contained material addressing J.C.'s two siblings in DCFS's custody as well.

2

## MOTION TO STRIKE

In addition to her two assignments of error, C.C. filed in this court a motion to strike certain portions of the appellate record now before us as well as portions of another appellate record in which we have rendered a separate opinion this day. *State ex rel. of B.C. and S.C.*, 14-1043 (La.App. 3 Cir. ___/___/15) (unpublished opinion). This other opinion involves the termination of C.C.'s parental rights to two additional children, B.C. (born February 27, 2010) and S.C. (born January 12, 2011). In the matter now before us, C.C. asserts that all of the appellate record now before us which might relate to B.C. and S.C. be stricken and that this court consider only those portions of the appellate record which relate to the termination proceeding.

At first glance, it would appear that the court reporter preparing the appellate court simply filed a copy of the record in Docket 14-1043 with the appellate record in this matter and that the duplicate record should not have been made a part of Docket 14-1043. However, during the testimony of Lindsey Gleason, a DCFS caseworker, counsel for DCFS offered into evidence the entire CINC record relating to B.C. and S.C., as well as the transcript of the June 23, 2014 termination proceeding involving those two children. In response, counsel for C.C. stated: "I'm not going to object to that, because my intentions are to try to consolidate the two appeals and have, hopefully, one single record and one appeal." The trial court responded, "All right." That being the case, we reject C.C.'s motion to strike as to this issue.[4]

---

[4] We will not repeat the evidence summarized in the opinion addressing C.C.'s parental rights to B.C. and S.C., and simply refer to that evidence by reference to the opinion in *State ex rel. B.C. and S.C.*, 14-1043 (La.App. 3 Cir. ___/___/15) (unpublished opinion).

# OPINION

Louisiana appellate courts review a trial court's findings regarding the termination of one's parental rights according to the manifest error standard of review. *State ex rel. K.G.*, 02–2886 (La. 3/18/03), 841 So.2d 759. Accordingly, a reviewing court must review the record in its entirety to determine whether a trial court's finding was clearly wrong or manifestly erroneous. The issue to be resolved by an appellate court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. *Stobart v. State through Dep't of Transp. & Dev.*, 617 So. 2d 880 (La.1993).

The laws of this state recognize that in any involuntary termination of parental rights proceeding, there are two private interests involved: those of the parents and those of the child. *State ex rel. J.A.*, 99–2905 (La. 1/12/00), 752 So.2d 806. Regarding these interests, the supreme court states:

> The parents have a natural, fundamental liberty interest to the continuing companionship, care, custody and management of their children warranting great deference and vigilant protection under the law, and due process requires that a fundamentally fair procedure be followed when the state seeks to terminate the parent-child legal relationship. However, the child has a profound interest, often at odds with those of his parents, in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, and continuous relationships found in a home with proper parental care. In balancing these interests, the courts of this state have consistently found the interest of the child to be paramount over that of the parent.
>
> The State's *parens patriae* power allows intervention in the parent-child relationship only under serious circumstances, such as where the State seeks the permanent severance of that relationship in an involuntary termination proceeding. The fundamental purpose of involuntary termination proceedings is to provide the greatest possible protection to a child whose parents are unwilling or unable to provide adequate care for his physical, emotional, and mental health needs and adequate rearing by providing an expeditious judicial process for the termination of all parental rights and responsibilities and to achieve permanency and stability for the child. The focus of an involuntary termination proceeding is not whether the parent should be deprived

of custody, but whether it would be in the best interest of the child for all legal relations with the parents to be terminated. As such, the primary concern of the courts and the State remains to secure the best interest for the child, including termination of parental rights if justifiable grounds exist and are proven.

*Id.* at 810–11 (internal citations omitted).

Article 1015 of the Louisiana Children's Code provides the statutory grounds by which a court may involuntarily terminate one's parental rights. Termination of parental rights requires a two-prong inquiry: first, the State must establish one of the enumerated grounds for termination, and second, the trial court must then find that termination of parental rights is in the best interest of the child. *State ex rel. S.M.*, 98-922 (La. 10/20/98) 719 So.2d 445; La.Ch.Code art. 1039. Additionally, the State must prove each element of one of the enumerated grounds for termination by a showing of clear and convincing evidence. La.Ch.Code art. 1035.

Louisiana Children's Code Article 1015(5) provides:

Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

Louisiana Children's Code Article 1036, entitled "Proof of parental misconduct," provides, in pertinent part:

C. Under Article 1015(5), lack of parental compliance with a case plan may be evidenced by one or more of the following:
….

(5) The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.

(6) The parent's lack of substantial improvement in redressing the problems preventing reunification.

(7) The persistence of conditions that led to removal or similar potentially harmful conditions.

D. Under Article 1015(5), lack of any reasonable expectation of significant improvement in the parent's conduct in the near future may be evidenced by one or more of the following:

(1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.
....

(3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior .

### *Assignment of Error Number One*

In her first assignment of error, C.C. argues that the trial court manifestly erred in finding that she had not substantially complied with her case plan and that there was no reasonable expectation for further improvement in her conduct in the near future. However, for the following reasons, we find this assignment of error to be meritless.

Lindsey Gleason, caseworker for DCFS, testified that J.C. came into the custody of DCFS after C.C. reported that a neighbor had sexually assaulted her and forced a crack pipe down her throat. According to Ms. Gleason, C.C. tested positive for cocaine at the time, and given her history and the concerns raised from the environment in which C.C. was residing, DCFS decided to seek J.C.'s custody.

6

Thereafter, DCFS compiled a case plan for C.C.'s compliance with the goal of reunification of C.C. and J.C. as mother and child. The components of the case plan included maintaining safe, adequate, and stable housing; maintaining an adequate income and providing proof thereof; paying parental contributions of $10.00 a month; submitting to mental health and substance abuse evaluations; attending anger management and parenting classes; and maintaining contact with DCFS.

According to Ms. Gleason, at the time of the termination hearing, C.C. was unemployed and living with her boyfriend and his parents. This living arrangement created a problem for DCFS because the boyfriend's parents refused to be fingerprinted by DCFS, a requirement for placement of the children in any home. Ms. Gleason testified that C.C. was made aware that the boyfriend's home was not a suitable placement for her child, but she chose to remain there. Also, Ms. Gleason testified that not only was C.C. unemployed at the time of the termination hearing, but she had been unemployed for at least six months.

Ms. Gleason acknowledged that C.C. did complete a twelve-week program to address her substance abuse as well as a parenting program ordered by the trial court. However, Ms. Gleason was of the opinion that C.C. never developed the parenting skills sufficient to raise her children. An Extra Mile report prepared by Monique Eller, a counselor with that organization, and introduced into evidence on the motion of DCFS, supported that opinion.

Annette Romero, CASA volunteer, testified that she had been involved with C.C. from the time the first two children came into DCFS's custody and continued that involvement when the same happened to J.C. Based on her observations of J.C. and C.C., she concluded that C.C. lacked the common sense, as well as the

support and skills, to raise her children. She testified that she did not see "any" change in C.C. over the course of the case and that C.C.'s reaction to J.C. was "something temporary or like a toy or something."

In its oral ruling, the trial court found that DCFS had established by clear and convincing evidence sufficient grounds for termination of parental rights under La.Child. Code art. 1015(5). Specifically, the trial court found that there had been a lack of substantial improvement in redressing the problems preventing reunification, that there had not been substantial compliance with the case plan, that C.C.'s conduct indicated that she was unwilling or unable to provide a safe, stable environment for the child, that there was no reasonable expectation of any significant improvement in the future, and that the conditions that led to removal continue to persist. After a thorough review of the record, we conclude that the trial court did not commit manifest error in ruling that DCFS proved by clear and convincing evidence that C.C. had not substantially complied with her case plan; and that there was no reasonable expectation for further improvement in the near future.

### Assignment of Error Number Two

In her second assignment of error, C.C. asserts that the trial court erred in finding that termination of C.C.'s parental rights was in the best interest of J.C. We also find this assignment of error to lack merit.

J.C. was five months old when DCFS was awarded his custody and has remained in DCFS's custody since that time. He was physically placed in the same foster care home with his older siblings, B.C. and S.C., who had been in DCFS's custody since April of 2012. The record establishes that the foster parents are committed to adopting all three children should they be freed for adoption.

8

Ms. Gleason testified that J.C. is bonded to his foster parents, considers them as parents, and refers to them as mom and dad. She stated that J.C. "lights up" when he sees his foster parents and runs to them when in need. Likewise, Ms. Romero testified that in her opinion, it was in J.C.'s best interests to be placed with his older siblings, and they should not be separated. Ms. Romero testified that there was a lack of connection between C.C. and her children, and she did not see any maternal instinct in C.C.

The trial court, in its oral ruling, stated:

> Everything I hear from both the caseworker and the CASA worker would indicate that the experience of [J.C.] in the home of the foster parents has been a positive, almost lifesaving event for him. To take him out of that environment that no one is comfortable with I do not think would comply with either the letter or the spirit of the children's code.

We find no manifest error in the trial court's determination that DCFS proved by clear and convincing evidence that termination of parental rights of C.C. was in the best interest of J.C.

## DISPOSITION

We deny the motion to strike and affirm the judgment of the trial court terminating the parental rights of C.C. to the minor child J.C. and certifying him for adoption in all respects. We assess all costs of this appeal to C.C.

**MOTION TO STRIKE DENIED; AFFIRMED.**

This opinion is NOT DESIGNATED FOR PUBLICATION.
Uniform Rules—Courts of Appeal, Rule 2-16.3.