| .WALTZER, Judge.
STATEMENT OF THE CASE
On 29 August 1989, New Orleans Police Department Detective Marlon Defillo swore an affidavit in support of an instan-tér order placing L.S., A.S. and their older brother, Le.S. in the temporary custody of the State of Louisiana, through the Department of Health and Human Resources. According to Det. Defillo, he responded to a claim of possible child abuse at Associated Catholic Charities. Officials with that agency witnessed the children’s mother displaying violent behavior toward the children, resulting in her attack on the eldest child, then six years old. Intervention efforts were unsuccessful because of the mother’s extreme hostile behavior. When District NOPD officers arrived, the mother was holding L.S. (then one year old) and A.S. (then 8 months old) in her arms. As the officers approached, she threw L.S. to the ground and began throwing gym bags on top of him. The mother resisted the officers’ attempts to subdue her, but she was finally subdued without injury to herself. The NOPD investigation revealed that because of prior cases when she was placed in public or private shelters and refused to conform to their policies, behaved “extremely violent[ly]” and took out her frustrations on her children, no local shelter was willing to accept her and her | ¡.children. As a result of the investigation, Det. Defillo placed the mother under arrest and charged her with violation of LSA-R.S. 14:93 (cruelty to juveniles). According to Det. Defillo’s affidavit, attempts were made to place the children with their maternal grandmother who refused.
On 11 September 1989, the juvenile court held a probable cause hearing for continued state custody, at which the mother and the children each were represented by counsel. The juvenile court rendered judgment awarding the provisional protective custody of the children to the State through the Department of Health and Human Resources pending further proceedings. On 20 November 1989, the juvenile court took testimony and received stipulated reports from the Office of Community Services (OCS) and Court Appointed Special Advocates (CASA). The court found it necessary to take the children into protective custody and awarded their care, custody and control to OCS for a period of eighteen months, having found that OCS had made reasonable efforts to prevent the removal of the children and to find suitable relatives for placement. The judgment also provided for case studies, psychiatric *603 and psychological evaluations, administrative review and parental visitation.
The matter came on for a six-month review hearing on 14 February 1990, after which the juvenile court ordered that the children should remain in OCS custody and provided for visitation. The juvenile court ordered the parents to attend parenting classes and therapy, and ordered the children’s mother to continue in vocational training. The case was set for a permanency planning hearing. Subsequently, on 30 June 1990, the juvenile court held a review hearing in the presence of the children’s parents and others, and rendered judgment continuing OCS custody, with placement of the three children in a single foster home, subject |ato liberal visitation and continuing the requirement of parenting classes and counseling for the parents.
After the permanency planning hearing on 16 January 1991, the court continued the children’s OCS custody, with placement in the home of their paternal aunt until OCS would be able to find a suitable foster placement. The court noted that the permanent plan would be for reunification of the family. The court continued the educational and counseling requirements contained in its earlier orders. On 22 February 1991 and 24 April 1992, the juvenile court appointed a Special Advocate on behalf of the children.
The juvenile court held hearings and continued OCS custody of the children on 28 August 1991, 19 August 1992, and 18 August 1993, the latter subject to an order to place the children with a relative in Michigan subject to additional approval by an unrelated agency. The court held that the permanency plan for the children was to be relative placement.
On 19 January 1994, the court continued OCS custody and noted that a favorable home study had been completed on the Michigan home of the children’s aunt and uncle. The court also noted that the mother, a chronic paranoid schizophrenic unable to care for herself, was then living in the Abode residential facility for adults with emotional disorders, and the father was not complying with court orders and had expressed a lack of interest in the children.
On 12 January 1995, the mother voluntarily filed an authentic Act of Surrender for the adoption of Le.S., L.S. and A.S. On 26 January 1995, the mother filed a motion in juvenile court to rescind the Act of Surrender. The record contains certificates from the mental health worker who examined the mother and Dattested to the mother’s capacity to execute the act and to the voluntary nature of the act, and a notice to the father.
On 19 January 1995, the juvenile court recessed the matter in order for the parents’ attorney to file written objection to the mother’s surrender of her parental rights, continuing all prior orders in full force and effect. The Department of Social Services sought supervisory review in this Court and moved to recuse the juvenile court judge who had been entrusted with this case since its original filing. That motion was denied on 16 May 1995. On 1 May 1995, the juvenile court judge amended the judgment of 19 January 1995 to reflect that further testimony should be taken concerning the mother’s understanding of the nature and extent of the Act of Surrender of Parental Rights. The State ultimately withdrew its motion filing the Act of Surrender.
On 25 January 1996, the juvenile court noted that the children were placed in a Therapeutic Foster Home where they had been living since 17 April 1995, continued the children in OCS custody, and provided for various types of therapy for the children and for bi-weekly visitation with their *604 mother. This placement was continued on 30 January 1997, at which time the court’s judgment noted:
The Court specially commends the case manager, Mary Peterson Mar-chand, for diligent efforts and a job well done, and orders that a copy of this judgment be forwarded to her supervisor and placed in her personnel folder.
OCS custody was continued at the post-permanency review hearings held on 22 January 1998, 21 January 1999 and 20 January 2000. At the 2000 post-permanency review hearing, the court noted its concurrence with the OCS/DSS permanency plan for long term foster care and granted an Adoption and Safe Families Act (ASFA) exception. The juvenile court found this placement to be in |Bthe best interests of the children, noting that the mother had been in substantial compliance with court orders and the case plan for family re-unification, but that the father had not, and continued bi-weekly maternal visitation.
On 26 July 2000, the juvenile court continued OCS custody and found that the mother has been in only minimal compliance with court orders and the case plan for family re-unification, and that the father has been in total non-compliance. The judge signed a stipulation and consent agreement on the same date agreeing that Le.S. would remain in his current placement at Boys Town. Upon release, anticipated for 9 August 2000, Le.S. would join his siblings in their current placement and continue with therapy and medication management.
On 24 January 2001, the juvenile court continued the children in OCS custody, and concurred in the OCS/DSS permanency plan for permanent alternative living arrangements. The court reaffirmed maternal minimal compliance and paternal total non-compliance with the court’s orders and the case plan for family re-unification. The judgment authorized bi-weekly supervised maternal and paternal visitation at the OCS office upon 24 hour prior parental notice to the OCS.
On 28 June 2001, the juvenile court judge signed a written stipulation and consent agreement between attorneys for OCS/DSS, the children, the mother and the case manager providing that the children would remain in their current placement and treatment, and noting that Le. S.’s case would be closed on his eighteenth birthday, 24 August 2001. Following the permanency review hearing on 28 June 2001, the juvenile court continued the children’s placement.
On 9 October 2001, counsel for L.S. and A.S. petitioned the juvenile court for a temporary restraining order and for a preliminary injunction prohibiting OCS | ¿from transferring the children’s case management from Ms. Mary Marchand to the St. John the Baptist OCS office. Counsel alleged irreparable harm should such a transfer occur.
The juvenile court heard testimony and received memoranda from counsel for all parties and, on 29 October 2001, granted injunctive relief requiring DSS/OCS to refrain from transferring the case management of this case from the Orleans region to the Thibodeaux or any other region; requiring DSS/OCS to refrain from permanently transferring or re-assigning this case to any case manager during Mary Marchand’s leave of absence, so that immediately upon her return she would resume all of her duties and responsibilities as case manager for these children.
DSS/OCS appeals from that judgment. We affirm.
STATEMENT OF FACTS
The juvenile court judge made extensive findings of fact, which we find to be supported amply in the record.
*605 Case manager Mary Marchand testified that she has been the children’s case manager since November 1994, when L.S. was six years old and A.S. was five. The children were thirteen and twelve, respectively, at the time of the injunction hearing. According to Ms. Marchand, she requested a leave of absence from 22 October 2001 through 14 December 2001 to learn to care for her elderly mother who would be living with her. She learned that DSS/OCS intended to transfer case management of the children from the Orleans region to the Thibodeaux region, offices that are approximately equidistant from the children’s domicile, and to [7continue the reassignment after Ms. Marchand’s return to work. She testified that during prior leaves of absence of short duration, DSS/ OCS maintained her as case manager upon her return. The juvenile court accepted her testimony that she established a good rapport with the children, their foster parents, the school social worker and the children’s teachers. According to Ms. Marchand’s uncontroverted testimony, the children are emotionally fragüe, and even slight changes in their emotional support systems would cause upset, resulting in behavioral or runaway problems. Ms. Marchand, acting in concert with the school social worker and others in the chüdren’s emotional support system, had been successful in obtaining favorable resolution of past problems. The juvemle court accepted her testimony that the transfer contemplated by DSS/OCS was not in the chüdren’s best interest, and averred that during her relatively short leave, she would make herself avaüable by telephone to assist with the chüdren’s care.
Ms. Annette Roche, Ms. Marchand’s immediate supervisor, testified on behalf of DSS/OCS. According to Ms. Roche, it is the prerogative of DSS/OCS to transfer a case between regions. She testified that her decision was based on the children’s location in Laplace, Louisiana, which is within the Thibodeaux region. Furthermore, Ms. Marchand was assigned in December, 2000 to a specialized unit. The juvemle court found that Ms. Roche was unable to explain why the case was not transferred to Thibodeaux six and a half years ago when the chüdren were placed with their current foster parents on 17 April 1995, or why the agency had |snot made the transfer in December, 2000 when Ms. Marchand was assigned to the “specialized unit.”
Significantly, Ms. Roche admitted that the case was not transferred immediately to another case manager because she was thinking about the chüdren’s best interests. Clearly, such a consideration is always paramount in disputes involving the care of chüdren. Ms. Roche admitted that maintenance of Ms. Marchand as case manager would not violate any DSS/OCS policy, but vacülated as to the policies of the agency.
The juvemle court concluded, based on the evidence, that the agency’s decision to transfer the case was arbitrary and inconsistent with the best interests of the chü-dren. He concluded that Ms. Roche’s testimony that the chüdren could overcome this disruption since chüdren in general can overcome changes in their lives reflected her insensitivity to the particular needs of these emotionaüy fragüe chüdren who are stül in therapy.
STANDARD OF REVIEW
The juvemle court has exclusive jurisdiction over chüd in need of care proceedings. LSA Ch.C. art. 303(2). The purpose of the chüd in need of care provisions of the Chüdren’s Code (Title VI) is to protect chüdren whose physical or mental health and welfare is substantiahy at risk of harm by physical abuse, neglect, or exploitation *606 and who may be further threatened by the conduct of others in various ways. Among the ways in which the Code provides in this respect is by |9child in need of care court proceedings. Title YI is intended to provide the greatest possible protection as promptly as possible for these children, and their health, safety and best interest shall be the paramount concern in all Title VI proceedings. Title VI is construed in accordance with LSA Ch.C. art. 102. LSA Ch.C. art. 601.
Article 102 provides that the Children’s Code shall be liberally construed to the end that each child and parent within its jurisdiction shall receive due process and that each child shall receive, preferably in his own home, the care, guidance and control conducive to his welfare. The Code shall be construed to promote family stability and secure simplicity in procedure, fairness in adjudication and administration, and elimination of unjustifiable delay. LSA Ch.C. art. 102.
In determining matters affecting minor children’s welfare, reasonable latitude must be left to the trial judge, and his judgment, based on facts disclosed in any given case, is entitled to great weight. State ex rel. Johnson v. Ashmore, 197 La. 971, 2 So.2d 897 (1941).
ASSIGNMENT OF ERROR: The juvenile court erred in granting a preliminary injunction ordering the DSS/ OCS to refrain from transferring the management of the case for L.S. and A.S. to the regional office where they reside and to refrain from transferring the case management to another case manager within the Orleans Parish office during the absence of the assigned case manager for extended family leave.
|inDSS/OCS contends that the juvenile court acted beyond the scope of its jurisdiction in granting the temporary restraining order and injunction in this case. These state entities suggest a narrow reading of LSA Ch.C. 302 which gives the special juvenile court created by law for Orleans Parish “exclusive original juvenile jurisdiction, and any other jurisdiction conferred by the statute creating them,” in that parish. “Judges of [special juvenile] courts shall exercise their juvenile jurisdiction according to the provisions of this Code.” LSA Ch.C. art. 302(1).
The state agencies contend that their statutory responsibility for the investigation, assessment and monitoring of cases of children adjudicated in need of care precludes any judicial review or intervention in their decisions concerning allocation of the child to a particular case worker or agency office. The agencies rely on the provisions of LSA Ch.C. arts. 610 and 612.
The Children’s Code requires that reports concerning child abuse or neglect be made to the local child protection unit of the DSS. LSA Ch.C. art. 610. DSS is required to investigate these reports and, in certain circumstances, to order more intensive investigation or apply for an evaluation order. LSA Ch.C. art. 612. Neither of these articles precludes a juvenile court from reviewing DSS/OCS actions that it finds to be detrimental to the child’s best interests, health or safety.
DSS/OCS also relies on LSA-Ch.C. art. 672 A, which provides, inter alia, that DSS “shall have sole authority over the placements within its resources and Insole authority over the allocation of other available resources within the department for children judicially committed to the department’s custody.”
This provision was added to the Children’s Code to comply with the Louisiana Supreme Court’s decision in State in the Interest of Sapia, 397 So.2d 469 (La.1981). DSS/OCS interprets these sources as precluding judicial review or other intervention in its decision- to transfer the children’s case from the DSS New Orleans *607 Office to the DSS Thibodeaux Office, and to remove the children from the supervision of their long-time caseworker.
According to the 1997 Official Comment to LSA Ch.C. art. 672:
This Article has been completely rewritten, though Paragraphs A and B continue the identical policy of the predecessor Article. In accordance with State in the Interest of Sapia, 397 So.2d 469 (La.1981), the juvenile court is without power to designate a particular treatment or placement choice when it assigns custody of a child to a state agency.... [Emphasis added]
In Sapia, a child was adjudged to be in need of care and committed to a private mental health facility, with custody of the child assigned to the Administrator of the facility, and with expenses to be paid by the state through the Department of Health and Human Resources. A companion case involved a child assigned to a private hospital with a concurrent order directing the state to assume financial responsibility for the child's treatment at the private facility. The state agency relied on former LSA-R.S. 13:1580 which provid1 ed that when a child is referred to the department for care and treatment to be provided in a facility other than the child’s home or the home of his or her relative, the child shall be assigned to the department’s custody, not to the custody of the facility. Furthermore, the | ^department “shall have authority to select from the resources that are available the types of services and service setting most appropriate to the child’s needs and to place the child in that setting.” LSA-R.S. 13:1580. (Repealed by Acts 1991 No. 235.)
The central issue in the Sapia ease and its companion was stated by the Louisiana Supreme Court as “whether the juvenile court judge, once he has assigned custody of the child to a private facility, can order the Department of Health and Human Resources to pay for the care and treatment of the child.” 397 So.2d at 474. That issue is not before us in the instant case. The juvenile court did not assign L.S. and A.S. to the custody of a private facility. Indeed, custody and payment for private services is not at issue in this ease. Whether the children’s case remains assigned to the New Orleans office or is transferred to Thibodaux, and whether or not the children’s long-term caseworker is relieved of her duties with respect to these children, the DSS/OCS financial responsibility essentially will be the same.
Sapia does not address the central issue raised in the instant case, that is, whether the children’s court-appointed counsel can seek judicial review of an agency decision that counsel and, in this case, the juvenile judge who has overseen these children’s case since its inception, believe to be contrary to the children’s best interests.
Unquestionably, once it has been assigned custody of a child in need of care, the DSS/OCS has authority to decide where a child is to be placed, whether in foster care, therapeutic foster care, or otherwise, and there is no statutory authority for a juvenile court to order the department to pay for therapy or for family members’ transportation costs. State in the Interest of J.H., 97-1291 (La.App. 4 Cir. 1/14/98), 706 So.2d 561. Likewise, it is the role of OCS, and not the courts, to determine domiciliary placement of children after termination of parental rights. However, the Louisiana Supreme Court has recognized a judicial review function. In discussing the relevance of letters from children’s relatives demonstrating a desire and potential ability to care for the children, the Supreme Court noted that although the DSS had sole authority to determine the children’s placement after the termination of parental rights, “the letters are relevant to the trial court’s approving placement in accordance with the best in *608 terest of the children.” State in the Interest of C.J.K and K.K., 2000-2504 pp. 12-13 (La.11/28/2000), 774 So.2d 107, 117.
This language is consistent with the general principle that all proceedings concerning children in need of care or services are to be governed by concern for the best interests of those children. This lodestone of the juvenile justice system is recognized, for example, in LSA-Ch.C. arts. 673, 675 and 677, all of which refer to the health and safety of the child as being the paramount concern in developing and implementing case management plans. Such provisions are meaningless without an opportunity for judicial review and we find nothing in the Children’s Code, statutes or jurisprudence that would allow untrammeled discretion to the state agencies where there is a showing of impairment of the children’s best interests, health or safety.
The judicial system is required to protect children’s rights to thrive and to survive. State in the Interest of S.M., 98-0922, p. 14 (La.10/20/98), 719 So.2d 445, 452. The juvenile court found, based on ample record evidence, that the proposed administrative reassignment of these children’s case to a new caseworker who had not developed relationships with the children, their school and other carejgjvers14 would needlessly impact the children’s right to thrive. This conclusion finds support in the record, and we find no contrary evidence.
The assignment of error is without merit.
CONCLUSION AND DECREE
For the foregoing reasons, the judgment of the juvenile court is affirmed.
AFFIRMED.