# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

**20-392**


**STATE IN THE INTEREST OF A.F.**


**\*\*\*\*\*\*\*\*\*\***


APPEAL FROM THE
THIRTY-SIXTH JUDICIAL DISTRICT COURT
PARISH OF BEAUREGARD, NO. JC-2012-0078
HONORABLE MARTHA ANN O'NEAL, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

**JOHN E. CONERY**
**JUDGE**

**\*\*\*\*\*\*\*\*\*\***

Court composed of John E. Conery, Van H. Kyzar, and Sharon Darville Wilson, Judges.


**REVERSED.**

**Thomas W. Sanders, Jr.**
**Regional Attorney, State of Louisiana**
**Department of Children & Family Services**
**1919 Kirkman Street**
**Lake Charles, Louisiana 70601**
**(337) 491-2067**
**COUNSEL FOR APPELLANT:**
    **State of Louisiana, Department of Children and Family Services**

**Rachel Louise Nastasi**
**Acadiana Legal Services Corporation**
**Post Office Box 4823**
**Lafayette, Louisiana 70502-4823**
**(337) 439-0377**
**COUNSEL FOR APPELLEE:**
    **A.F. (Juvenile)**

**CONERY, Judge.**

The Louisiana Department of Children and Family Services (DCFS) appeals the April 28, 2020 Order of the trial court requiring the DCFS provide retroactive foster care assistance to A.F., whose placement was in the home of her Godparents and who were not properly certified to legally receive foster care assistance. For the following reasons, we reverse.

## FACTS AND PROCEDURAL HISTORY

In this case we are called upon to review the trial court's authority in issuing an Ex-Parte Order on April 28, 2020, requiring the DCFS to provide "Retroactive Foster [C]are Assistance be made to [A.F. in] her current placement in the home of [F.H and L.S.]."[1] At the time the April 28, 2020 Ex-Parte Order was issued, the Godparents had not completed the certification process to become eligible for foster care assistance from the DCFS. The certification of the Godparents was ultimately completed on May 26, 2020, and the Godparents became legally eligible to receive and did receive foster care assistance on behalf of A.F. on and after that date. However, we reverse the trial court's ruling ordering retroactive foster care assistance prior to May 26, 2020.

A.F. was placed in the custody of the DCFS on September 25, 2012 and adjudicated in need of care on December 4, 2012. Her parents parental rights were terminated on March 20, 2014. The trial court judge has handled her case since its inception. Custody of A.F. was assigned to the DCFS for a period of at least seven years prior to a hearing held on February 26, 2019. Present at that hearing were the representatives of the various parties, including counsel for A.F. and the DCFS,

---

[1] Pursuant to Uniform Rules—Court of Appeal, Rule 5-2, initials are used throughout to ensure the confidentiality of the minor.

along with both CASA and DCFS representatives. A.F. was also present as she was then sixteen and able to speak for herself.

During her custody with the DCFS, A.F. had been placed in a series of foster homes and behavioral facilities. At the time of the February 26, 2019 hearing, A.F. was housed at Cane River, a behavioral modification facility, where she was supposed to be attending Natchitoches Central High School. At the time of the hearing, she was not attending school, had been a runaway, and was not attempting to complete her behavioral requirements. A.F. expressed her plan to get a job, as she was now sixteen, to quit school and acquire her GED.

The trial court admonished A.F. and indicated that education was going to be an important component of the court's orders. A.F. had apparently had a change of heart and now wanted to be adopted, although Alternative Permanent Living Arrangements (APLA) could also be possible. If so, she would then have an opportunity to participate in the transitional living program. Nonetheless, adoption was A.F.'s first choice.

Cheryl Cotton, a Child Welfare Adoption Specialist from the Lafayette Region of the DCFS, testified at the hearing. When asked if there was anyone who could be a possible potential foster placement for A.F., Ms. Cotton responded that A.F.'s Godparents had a strong interest in going through the DCFS Certification process to become a certified foster placement. The couple had taken some time to come to this decision, which began with only an interest in being a "visitation resource."

At a hearing on February 26, 2019, Ms. Cotton testified that the Godparents' home had been approved as a visitation resource. A.F. was then allowed to visit them at their home in New Orleans on a home pass from the Cane River facility.

2

After the visit by A.F., the Godparents expressed their interest in being foster parents for A.F. Ms. Cotton testified that the Godparents would have to be certified, and the certification process would not be handled through the Lafayette Region, but instead would be conducted by the New Orleans Region. Ms. Cotton told the trial court that the two regions were in contact and the time required to complete the process would depend on when and if the couple could attend the required classes in New Orleans and complete the necessary requirements to qualify for certification.

The trial court then had a frank discussion with A.F. about her alternatives if her Godparents were unable to take her on a permanent basis. After a stern and descriptive discussion with A.F. on her options, A.F. indicated her understanding that she needed to re-connect with the Cane River program, complete her required phases, and return to school at Natchitoches Central, awaiting the possible approval of her Godparents as a properly certified foster care placement. The trial court further explained that Cane River was her only option. Without her finishing her phases at Cane River, it would be unlikely that any certified foster home would take her as a foster child, fearing that if she were a rule breaker at Cane River, she would also be unable to follow the rules in a new foster home.

At the conclusion of the February 2019 hearing, the trial court ordered that A.F. go back to Cane River, complete her schooling and try to get into the "HiSET Program."[2] The trial court also asked that information be provided at the next

---

[2] Louisiana uses the HiSET exam for the state's High School Equivalency (HSE) testing program. HSE testing offers persons who quit high school prematurely another opportunity to earn an equivalent degree. The HiSET exam includes five tests in the fields of science, writing, reading, social studies, and math.

hearing on the progress of the Godparents in the certification process, and whether they had changed their minds about becoming a certified foster care placement for A.F. The next hearing for A.F. was set for April 2019.

After the February 2019 hearing, A.F. went back to Cane River and began doing well. At the April 2019 hearing, the trial court ordered that the home study in Orleans Parish be completed so that the Godparents could begin their training to become a certified foster care placement. The trial court set a special court date for the next hearing for July 25, 2019.

However, at the July 25, 2019 hearing, the New Orleans Region reported that the Godparents' home needed repairs and could not be certified without repairs being made to the residence. There was a problem with the flooring and possible termites. No written report was submitted to the trial court, only an email without further specifics. However, in July, the Godparents were approved for home visitation. A.F. had completed her required phases at Cane River, and was doing well in school. Both the DCFS and the trial court were anxious to allow A.F. to have extended visitation in the home of the Godparents in the hope that the couple would move forward and complete the necessary steps to become a certified foster care placement and then seek to adopt A.F. Therefore, in July 2019, the trial court ordered that A.F. be placed in the home of her Godparents in New Orleans and that DCFS obtain the documents for A.F. to enroll in school there.

Since adoptive placement and or custody would require A.F. to be in the Godparents' home for six months, the trial court determined it was in A.F.'s best interest to be placed with her Godparents, as they had been certified for extended visitation. The plan was to complete the home study and the other necessary requirements for the Godparents to be certified for foster care placement, and to

4

make sure that adoption was the path they wished to pursue with A.F.

The trial court gave the DCFS thirty days to compete the home study, or she would hold them in contempt. The attorney for the DCFS clarified to the trial court that there was no money available to help the Godparents repair the problem with the floor or the termites. At this juncture, without home study certification, the Godparents' training for certified foster care placement for A.F. was put on hold. However, they were qualified to attend a shorter version of the regular training for a child specific placement. The trial court also suggested the Godparents attend the next hearing scheduled for October 8, 2019.

At the October 2019 hearing, Ms. Cotton gave an oral report on the home study status. She reported that the home study was conducted, but not reduced to writing. The DCFS wanted A.F. to continue her placement with the Godparents. As the current DCFS case plan was for A.F. to be adopted, the DCFS was hoping to have the Godparents' repair problems corrected so they could be certified for foster care placement, which would lead to an adoptive placement for A.F.

However, the DCFS agreed that guardianship custody to the Godparents for A.F. would be another solution to the problem if the home were unable to be certified. The DCFS had recommended guardianship to the Godparents, but that would mean that the DCFS would relinquish any further responsibility for A.F. The trial court then determined that it was too early to know if the Godparents "want adoption versus guardianship[.]" When questioned by the trial court if the Godparents had been asked about their preference, Ms. Cotton indicated that they would have to discuss the matter further, that they were not in a position to agree to adoption at this time, but that they "may be more agreeable to guardianship or custody[.]"

The trial court then discussed the needed repairs to the home with Ms. Detra P. Ward, the DCFS Child Welfare Manager for Adoptions and Foster Care in the New Orleans Region. The bottom line of this discussion was that the Godparents' home needed repairs to become certified and that the Godparents needed financial assistance to make the repairs and to maintain A.F in their home. There was no one available at that time who was able to loan or give them the money to make the repairs.

The trial court found, "So, it's a never-ending matter. They can't [g]et certified to get financial assistance and they need financial assistance to make repairs and get certified. So, there is no answer to this situation; is that true?" Ms. Ward replied, "Unless the family want's [sic] custody and would just assume … [guardianship]." The trial court ordered Ms. Ward to have a list of repairs sent to her office by November 8, 2019. The trial court determined from A.F.'s Godmother that A.F. was doing well in school and enjoying singing in the choir. The trial court then set another hearing for December 3, 2019, requesting that the Godparents and A.F. be in attendance.

None of the parties attended the December 3, 2019 hearing, other than counsel for A.F. and the DCFS. Based on the lack of attendance by the caseworkers, the trial court refixed the review hearing and a possible contempt hearing for February 4, 2020. The trial court also issued subpoenas for the caseworkers and, specifically, for Ms. Monique Richardson, who had actually physically conducted the home study. The trial court also signed an Order to this effect ordering both Ms. Richardson and Ms. Ward to be present at the hearing on February 4, 2020.

At the February 4, 2020 hearing, Ms. Cotton testified that A.F. was happy in

her Godparents' home and that she wished to stay in that placement. Despite the lack of a home study, the trial court approved the placement. The parties and the trial court discussed the issue of A.F.'s age, seventeen, and that she would turn eighteen in January of 2021. The trial court instructed A.F. that she needed to speak with her counsel and with the representative from CASA about her options. A.F. expressed her wish to remain in her placement with her Godparents and to also pursue participation in the APLA program if possible.[3]

Ms. Ward testified concerning the potential contempt charge and those issues were explained to the trial court's satisfaction. The trial court did not hold Ms. Ward or Ms. Richardson in contempt and dismissed Ms. Richardson from the case, as she had been transferred to another position in the DCFS. The trial court set the next hearing for April 28, 2020.

This court notes that due to the COVID-19 pandemic, state offices were open on a restricted basis and there was a stay at home order for the general public in effect beginning April 2, 2020. Therefore, the April 28, 2020 hearing was held by phone and Skype. Ms. Ward from the DCFS testified that all that was left for the certification of the Godparents and the completion of the home study was documentation of the Godmother and her adult children's physician examinations; the Godfather undergoing his physical examination and providing documentation, which was problematic due to his lack of insurance coverage and the effects of the pandemic; a certified copy of Godmother's marriage license; and the DCFS calling and or emailing the Godparents' references. The problem with the condition of the Godparents' home had been previously resolved through another agency. Thus, at

---

[3] The APLA is the acronym for the Alternative Permanent Living Program, which is a transitional living program available when a child ages out of foster care.

the April 28, 2020 hearing, the condition of the Godparents' residence was no longer an impediment to the completion of the home study and certification.

The trial court ordered that A.F. remain in the custody of the State, via the DCFS, with the goal of adoption in the home of her Godparents, and that the DCFS assist as possible to complete receipt of the medical reports and physical examination of her Godfather, along with the marriage license and checking of the Godparents' references.

After the DCFS clarified with the trial court the remaining items that needed to be completed for the Godparents to officially become certified and therefore become eligible under the DCFS regulations to receive foster care assistance on behalf of A.F., the trial court informed all parties that it had received from A.F.'s counsel an Ex-Parte Motion and Order requiring the DCFS to pay retroactive foster care assistance to the Godparents on behalf of A.F. The trial court also ordered that a copy of the Ex-Parte Motion and Order be served on all parties and thus be made part of the record. Prior to the hearing, the trial had signed the Ex-Parte Order and dated it April 28, 2020.

The Ex-Parte Motion stated that "a home study was never conducted of the household since the child has been placed in the home of her relatives [on] July 2, 2019." The motion sought financial assistance "based solely on the department's failure to properly take steps to certify the home." It further requested that "payments should be made retroactive to the date of the first request for a home study last year [in] March 2019."

The Ex-Parte Motion was signed by counsel for A.F., but the signature line on the Certificate of Service was unsigned. It is undisputed that the Ex-Parte Motion and Order were never served on any of the participants in this case,

8

including counsel for the DCFS. The attached Ex-Parte Order stated, " Considering the above and foregoing motion. IT IS ORDERED that [] Retroactive Foster [C]are Assistance be made to the minor child [in] her current placement in the home of [F.H. and L.S.]"

Subsequently, on May 26, 2020, the DCFS approved the Godparents' home for certification. According to the DCFS regulations, foster care assistance payments were made on behalf of A.F. to the Godparents, from May 26, 2020 forward until January 6, 2021, when A.F. "aged out" of foster care.

The DCFS does not dispute that after the Godparents were properly certified, foster care assistance was owed and paid by the DCFS from the date of that certification. That issue is not before this court. However, the DCFS does dispute the court-ordered retroactive foster care assistance contained in the trial court's Ex-Parte Order of April 28, 2020. The DCFS asserts that the court's ruling ordering the payment of retroactive foster care assistance is in violation of La.Ch.Code art. 672, which is the basis of the DCFS's timely filed appeal. The DCFS also filed Peremptory Exceptions of No Right and No Cause of Action with this court in conjunction with its appeal.

**LAW AND DISCUSSION**

*Standard of Review*

"Questions of law, such as the proper interpretation of a statute, are reviewed by this court under the *de novo* standard of review." *Louisiana Mun. Ass'n v. State*, 04-0227, p. 35 (La. 1/19/05), 893 So.2d 809, 836. "When a trial court commits an error of law, the reviewing court is not subject to the manifest error standard and can make an independent determination of the facts from the record on appeal." *Arabie Bros. Trucking Co. v. Gautreaux*, 03-0120, p. 7 (La.App.

1 Cir. 8/4/04), 880 So.2d 932, 938, *writ denied*, 04-2481 (La. 12/10/04), 888 So.2d 846.

We find that La.Ch.Code art. 672 is applicable to the issue before this court. Therefore, its interpretation is subject to a *de novo* standard of review on appeal. In a case involving a child in the custody of the DCFS, La.Ch.Code art. 672 controls the ability of the trial court to order the expenditure of the DCFS's resources, and provides in pertinent part as follows:

> A. (1) Whenever custody of a child is assigned to the Department of Children and Family Services, the child shall be assigned to the custody of the department rather than to a particular placement setting. The department shall have authority over the placement within its resources and the allocation of other available resources within the department for children judicially committed to its custody.

> (2) Upon motion of the court, for good cause shown, a contradictory hearing shall be held and thereafter, the presiding judge shall have the authority to disapprove a placement chosen by the department if it is not in the best interest of the child and shall issue a written order that the department choose a more suitable placement with reasons supporting the court's decision.

The 2001 amendments to La.Ch.Code art. 672 clarify that the state licensing requirements applicable to non-relative foster homes must now also be applied to relative foster homes.[4] The law requires that all licensing and approval

---

[4] Louisiana Children's Code Article 672, cmt 2001 provides:

> The 2001 amendments clarify the rule that an assignment of legal custody to the department, regardless of the stage of the proceedings, confers the exclusive authority of the department to determine a particular placement of a child. In addition, federal regulations implementing the Adoption and Safe Families Act (ASFA) of 1999, 42 U.S.C. 601 et seq., P.L. 105-89, provide that the same state licensing requirements applied to non-relative foster homes must be applied to relative foster homes; thus, the state will not receive federal reimbursement of foster care expenses for any children who are placed in relative foster homes that do not meet all licensing and approval requirements, notwithstanding the state legislative preference expressed in Articles 622(A) and 627(B).

requirements be met, or the state will not receive federal reimbursement of foster care expenses.

Louisiana Children's Code Article 672(A)(1) clearly states, "Whenever custody of a child is assigned to the Department of Children and Family Services, the child shall be assigned to the custody of the department rather than to a particular placement setting." The article further provides that, "**The department shall have authority over the placement within its resources and the allocation of other available resources within the department for children judicially committed to its custody.**" *Id.* (emphasis added).

It is undisputed that A.F. had been in the custody of the DCFS for many years and that the trial court was anxious to have her placement settled as she was approaching the age of eighteen, when she would no longer be eligible for foster care assistance. Our review of the record in this case demonstrates that this seems to have been the goal of all concerned. All parties also wanted A.F. to take responsibility for her life and make it possible for her to reach her goal of adoption.

This opportunity presented itself when A.F. was sixteen when her Godparents expressed an interest in possibly providing A.F. with some form of care. This interest by the Godparents prompted A.F., who had been through a number of foster homes and was at that time at Cane River, a behavior modification facility near Natchitoches, to turn her life around. She then began to take the steps necessary to complete her phases and excel in her schoolwork at Cane River.

However, despite the hope that the Godparents would qualify for possible foster care certification, the condition of their home in New Orleans prevented a permanent placement. The trial court recognized this impasse and discussed it at

length on the record. Ultimately, the DCFS was able to qualify the Godparents for home visitation. When the necessary repairs could not be made to the Godparents' home, the trial court ordered that A.F. be granted extended visitation with the Godparents beginning in July of 2019, that she be transferred from the Cane River facility, and that she be allowed to attend school in New Orleans, La.

The authority for the trial court to transfer A.F. to her Godparents' home on a semi-permanent basis stems from La.Ch.Code art. 672(A)(2), which allows a trial court to disapprove a placement if it is not in the best interest of a child. In this case A.F. had completed her required course at Cane River and was doing well in school, primarily based on her belief that she would be able to be with her Godparents. Accordingly, the DCFS agreed that A.F.'s best interest would be to allow her to go to her Godparents' home in New Orleans and continue her schooling there, despite the fact that the Godparents had not been formally approved as a foster care placement, and therefore could not receive foster care assistance for A.F.

At this juncture in July 2019, and once again in October 2019, the intention of the Godparents was still unclear as to what path they intended to take with A.F. They clearly stated, however, that they were financially unable to make the required repairs and also take care of A.F. without some assistance. A.F. was doing well in their home, and the DCFS was continuing to try and work out the situation in order to qualify the Godparents to care for A.F. on a more permanent basis and to obtain foster care assistance.

The hearing in February 2020 clearly indicated that all parties were working together and trying to seek the eventual outcome, which resulted in the Godparents finally being certified as a foster care placement on May 26, 2020. A.F. remained

in their home, and the DCFS paid foster care assistance for A.F. from May 26, 2020 until she turned eighteen in January 2021.

The DCFS only appeals the trial court's Ex-Parte Order of April 28, 2020 requiring them to pay retroactive foster care assistance to the Godparents, prior to their completion of the certification process. However well-intentioned and fair, the jurisprudence interpreting La.Ch.Code art. 672 provides that the trial court had no authority to order the DCFS to expend its resources in this manner.

In the case of *State in Interest of D.R.P.*, 13-1275 (La.App. 3 Cir. 3/5/14), 134 So.3d 259, the trial court ordered that the entire family, including the parents and four children who had been placed in the custody of the DCFS, were to submit to psychological evaluations by a specifically named psychologist and that the DCFS was to pay for the evaluations. Despite the fact that psychological testing was part of the DCFS case plan, a panel of this court cited La.Ch.Code art. 672 and the following jurisprudence and concluded that "the trial court cannot order the [DCFS] to pay for the services of a private psychologist of its choosing." *Id.* at 261. *See also State in Interest of Sapia*, 397 So.2d 469 (La.1981); *State ex rel. L.S.*, 01-2215 (La.App. 4 Cir. 3/20/02), 814 So.2d 601, *writ denied*, 02-957 (La. 4/17/02), 813 So.2d 414; *State in Interest of J.H.*, 97-1291 (La.App. 4 Cir. 1/14/98), 706 So.2d 561; *State in Interest of D.G.*, 503 So.2d 132 (La.App. 5 Cir. 1987); and *State in Interest of J.M.*, 490 So.2d 444 (La.App. 5 Cir. 1986).

In this case, although the trial court placed A.F. with her Godparents without proper certification, it was with the approval and agreement of the DCFS. However, the placement was only on a semi-permanent visitation basis until May 26, 2020, when the Godparents were finally properly licensed and approved for

13

foster care placement and foster care assistance could properly be given for A.F.'s care.

Therefore, we find that the trial court committed an error of law by ordering the DCFS to pay retroactive foster care assistance for A.F. prior to May 26 2020. We will pretermit any review of the DCFS's Peremptory Exceptions of No Right and No Cause of Action as the exceptions have been rendered moot by this court's ruling in this case.

## CONCLUSION

For the foregoing reasons, the Ex-Parte Order of the trial court dated April 28, 2020, ordering the Department of Children and Family Services to pay retroactive foster care assistance on behalf A.F. is reversed. The Department of Children and Family Services Peremptory Exceptions of No Right and No Cause of Action are rendered moot.

**REVERSED.**